*In re* DAVID P. TUNTLAND.—(THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, *v.* DAVID P. TUNTLAND, Respondent-Appellant.)

First District (4th Division)    No. 78-424

Opinion filed April 12, 1979.

James J. Doherty, Public Defender, of Chicago (Anthony F. Rusnak and Timothy P. O'Neill, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Mary Ann Callum, and Stephen D. Ferrone, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE JOHNSON delivered the opinion of the court:

This is an appeal by respondent, David P. Tuntland, from an order of the circuit court of Cook County finding him to be a person in need of mental treatment as defined in the Mental Health Code of 1967 (Ill. Rev. Stat. 1977, ch. 91½, par. 1—11) and ordering his immediate hospitalization. On appeal, respondent contends his commitment for mental treatment following a proceeding in which he was unassisted by counsel was fatally defective. Ill. Rev. Stat. 1977, ch. 91½, par. 9—4.

A petition for respondent's hospitalization was filed in the circuit court of Cook County on November 21, 1977, by Martell Tuntland, respondent's father, alleging that respondent was in need of mental treatment as defined in section 1—11 of the Mental Health Code, and that respondent was likely to physically harm himself or others if not immediately hospitalized. On that date, the trial court entered a written order setting the petition for hearing and ordering that the public defender act as counsel for the patient at the hearing.

At the commencement of the hearing on the petition held on November 24, 1977, the following proceedings took place:

"THE CLERK: David Tuntland, 77 CONMT 3553.

(witnesses duly sworn)

THE COURT: Ready to proceed?

MR. DILLON [Assistant State's Attorney]: The State is ready.

MR. ALLEN [Assistant Public Defender]: At this time I'd like to call the Court's attention to the fact that the Respondent wishes to represent himself and has made that quite clear to me, your Honor.

THE COURT: Did you explain to him—

THE DEFENDANT: I've had bad luck with other lawyers representing me.

THE COURT: You have a right to represent yourself, but notwithstanding that, the Court has the obligation and will exercise the obligation to appoint the public defender to guide you. He's only going to tell you what in his judgment you ought to do relative to objections and other matters of procedure. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: If you don't choose to ask him any questions, that's up to you, but the Court will appoint the public defender to act as a guide to you on matters relative to court procedure, and of course if he sees fit anything should be radically wrong, he may make an objection."

Phyllis Ann Tuntland, respondent's mother, testified that respondent resided with her in Joliet from September 23, 1977, until November 18, 1977, when he went to Tinley Park hospital. When his car would not start, he thought somebody had "bugged" it and was trying to keep him from going about his business. He said there was a homing device in his car, in his glasses and in his room whereby people, whom he believed to be Germans, could follow him. During cross-examination conducted by respondent, she was asked why she thought he was dangerous and she responded:

"The idea that you feel that Hitler is still alive and you have to apprehend him and take him before the F.B.I. to clear you name; that you feel that people are getting in your way; asking us to take lie detector tests for non-essential things,—these bizarre ideas that you have."

On redirect examination, she testified respondent had told her and her husband on Sunday night that he had obtained a gun permit so that he could go to Las Vegas to apprehend an individual that he thought was Adolph Hitler, who he believed was still alive. She had many conversations with respondent about Hitler over the past 5 or 6 years and respondent "was once picked up because he accosted or grabbed onto somebody that he felt was Adolph Hitler."

Martell Tuntland, respondent's father, testified he also had discussions with respondent in which he said he was going to get Hitler. Sunday night at the Tinley Park Mental Health Center, respondent had said he believed Hitler was still alive, and he was about the only one who believed this. Respondent also expressed the view that it was up to him to find Hitler and bring Hitler to the FBI so he could clear his name and prove Hitler is alive.

Mr. Alfred Swartz, employed as a clinical psychologist at Tinley

Park, testified that he saw respondent in the unit the previous day with Dr. Golchini. This was respondent's third hospitalization. Respondent questioned whether he should be in the hospital saying he was not dangerous to himself or society and that the only reason he was in the hospital was because he had attempted to buy a gun. Respondent reiterated his beliefs about Hitler to this witness and claimed that he could send the trial judge to China if he were committed. When respondent questioned the witness about the basis for his belief that respondent was dangerous to society, the following colloquy took place:

"A [Mr. Swartz]: It is the presence of delusions and the reason that you attempted to purchase a gun.

Q Is that the way you care to state it—the presence of delusions? Would you like to work on the fact that whether Adolph Hitler is alive or not is a fact or not a fact?

MR. DILLON: Objection.

THE COURT: The objection is overruled.

THE WITNESS: What's the question?

THE DEFENDANT: Whether or not Adolph Hitler is still alive. You were aware of the way the body was identified, that it was through a German dentist?

MR. DILLON: Objection, irrelevant.

THE DEFENDANT: This German dentist was in the Third Reich.

THE WITNESS: I'm aware of the fact that it is the belief that is known today that Adolph Hitler died a long time back in a fire.

THE DEFENDANT: Are there any other people today that believe Adolph Hitler is alive?

THE WITNESS: I don't know.

THE COURT: That objection is sustained as being irrelevant.

THE DEFENDANT: Your Honor, the psychiatrist has testified that the former hospitalizations of me are not relevant to my present commitment. I believe it's only a matter of this gun permit. If a man is ordering a gun permit, does that make him dangerous to society? And if Adolph Hitler is out there, which I can prove— there was a Nazi war criminal captured in Miami Beach—

THE COURT: Are you asking the court? I have no answer for your question."

Dr. Mehdi Golchini, a psychiatrist at Tinley Park Mental Health Center, testified he had examined respondent with Mr. Swartz. Respondent said he was in the hospital because he wanted to get a gun permit, but the State police brought him to the institution. When asked why he wanted to have a gun, he first said that was his personal business, then said he wanted the gun because he believed Hitler was alive and he

had seen a man resembling Hitler 3 years ago in Las Vegas. Respondent believed that he had a responsibility to get this man and bring him to justice and nobody was going to stop him. In this witness' opinion, respondent was suffering from paranoid schizophrenia, and on the basis of his delusions he is dangerous to others.

The court found respondent was in need of mental treatment and ordered him hospitalized for that purpose. The following proceedings then took place:

"Now the Court informs you, Mr. Tuntland, that you have a right under the law to appeal any judgment of this Court. Obviously you don't know the technicalities involved in a appeal, and for the purpose of fully informing and advising you, I will tell you that the assigned public defender is still assigned for the purpose of advising you as to your rights or to represent you on any matter of appeal here.

THE DEFENDANT: I couldn't trust my first public defender. I don't believe I can trust the second one.

THE COURT: You have a right to engage private counsel if you can afford it.

THE DEFENDANT: It would cost too much money.

THE COURT: That will be the order."

On appeal, respondent contends he was not represented by counsel, as required by statute, but was only "assisted," and that the statutory language requires that he be represented. Section 9—4 of the Mental Health Code of 1967 (Ill. Rev. Stat. 1977, ch. 91½, par. 9—4) provided, in part:

"At any hearing under this Act, the court shall inform the person asserted to be mentally retarded or to be in need of mental treatment of his right to counsel and ask if he desires counsel of his choice to be summoned or counsel to be appointed by the court, and the court shall require that such person's request for counsel be complied with and that in all events each person is represented by counsel. Counsel shall be allowed time for adequate preparation and shall not be prevented from conferring with the person at reasonable times nor from making such reasonable investigation of the matters in issue and presenting such relevant evidence at such hearing as he believes is necessary to a proper disposition of the proceedings."

The State contends the respondent is not deemed to have waived counsel where he is permitted by the court to conduct his own defense with the assistance of a court-appointed lawyer, citing *In re Boswell* (1978), 62 Ill. App. 3d 1033, 1034, 379 N.E.2d 658, 659. In *Boswell*, respondent contended he did not effectively waive his right to counsel.

Prior to commencement of the hearing, respondent had informed the court of his desire to represent himself. However, he also requested that the public defender be present to act in a guidance capacity only. The court then appointed as "co-counsel" an assistant public defender who was present throughout the hearing. This court found respondent did not waive his right to counsel when he requested to conduct his own defense with the assistance of a court-appointed lawyer, but, instead, sought the best of each situation, freedom to conduct his own defense and benefit from the assistance of counsel.

Although the record in this case shows that counsel had previously been appointed, respondent claims that the court was, nevertheless, required to advise him of his right to counsel. However, respondent claims that the trial court "merely acceded" to his request to proceed *pro se*. In addition, respondent contends counsel was relegated to an advisor rather than an adversary on respondent's behalf, and that counsel's actual participation at the hearing, which was limited to a single objection and a stipulation to certain portions of evidence, did not constitute representation by counsel. Respondent seeks to distinguish *In re Boswell* on the ground that counsel there was appointed to "actively assist" respondent as an adversary, whereas in this case counsel was limited to the role of advisor.

■■ This case raises the question of how the court, which has already appointed the public defender to represent the patient in the proceedings, should respond when, at the start of a commitment hearing, the court is informed by appointed counsel that respondent has expressed a wish to represent himself. The statute recites that the court shall inform the person of his right to counsel at the hearing and ask if he desires counsel of his choice to be summoned or counsel to be appointed by the court. Where counsel has already been appointed, as here, we conclude that such omission, if error, could not constitute reversible error since counsel was actually provided. It is reasonable to presume, since counsel has already been appointed, that respondent knew of his right to retained counsel, but was unable or unwilling to retain counsel. (*Cf. People v. McKinney* (1978), 62 Ill. App. 3d 61, 378 N.E.2d 1125.) In this case, at the conclusion of the hearing, when the court informed respondent of his right to engage private counsel, respondent indicated he could not afford it. Under the circumstances, we conclude that the court's failure to specifically inform respondent at the hearing of his right to counsel and to ask if he desired counsel of his choice to be summoned or counsel to be appointed by the court did not constitute reversible error.

■■ We also conclude that the trial court acted properly and in accordance with the statute in allowing respondent's request to represent himself and appointed the public defender to "guide" respondent. It has

been aptly stated that: "Permission for a defendant to proceed *pro se* but with the aid of counsel is recognized and used as an aid by the court to protect the judicial process from deterioration and the *pro se* defendant who is unable to defend himself (*People v. Allen* (1967), 37 Ill. 2d 167, 226 N.E.2d 1)." (*People v. Guthrie* (1978), 60 Ill. App. 3d 293, 296, 376 N.E.2d 425, 427.) Respondent vigorously cross-examined the State's witnesses and was quick to interrupt the direct testimony of the State's witnesses with objections when he thought the witnesses were not testifying truthfully or accurately. We have reviewed the entire record and conclude that the trial court acted properly in ordering appointed counsel to remain and "guide" respondent, and respondent received effective assistance of counsel according to the circumstances presented. Compare *People v. Gerich* (1974), 22 Ill. App. 3d 575, 317 N.E.2d 724.

Respondent has cited *Dooling v. Overholser* (D.C. Cir. 1957), 243 F.2d 825, which held that District of Columbia statutory law required appointment of either an attorney or a guardian *ad litem* to effectuate the person's right to counsel. However, we find the remarks of that court in the subsequent case of *In re Basso* (D.C. Cir. 1962), 299 F.2d 933, are more appropriate. There, although a guardian *ad litem* had been appointed, Mrs. Basso demanded the right to act as her own attorney. When the court informed her the guardian *ad litem* would act as her counsel, she objected to her court-appointed counsel, demanded to act as her own attorney, conducted her own trial and then appealed. The court found that any error was not prejudicial, stating, at page 934:

> "Had the trial judge appointed other counsel he would have been on sounder ground; however, under the circumstances of this case, it is clear that appellant was in nowise prejudiced. No one can read her questions and comments and have any doubt that she seriously lacked orientation.
>
> It must be recognized that cases of this nature, in many instances, create a troublesome and embarrassing situation for counsel appointed as guardian *ad litem*. To a very noticeable degree the present case spotlights the practical difficulties that may, and often do, arise in such proceedings.
>
> An aggressive and vocal woman, Mrs. Basso vehemently demanded the right to conduct her own defense. As an example, when the first witness, the policewoman, had completed her direct examination, the guardian *ad litem* proceeded to question her, eliciting the fact that no one was present when her interview with appellant took place. He was interrupted by appellant as follows:
>
> 'Mrs. Basso: Your Honor, I would like to rebut this witness.'
>
> The court then permitted appellant to go ahead, and from then on she conducted the proceedings.

Our reading of the entire transcript demonstrates that nothing could have stopped Mrs. Basso from having her say to the jury. In such circumstances it would be unrealistic to expect a guardian *ad litem* to do more than protect procedural rights. Certainly so long as this procedural protection is accorded the alleged insane person, as was done in the instant case, it cannot be said that the commitment proceeding was void merely because the guardian *ad litem* was convinced in his own mind that commitment and treatment were proper in the circumstances. Indeed, as this case so graphically demonstrates, no rational person could possibly have had a different opinion with respect to Mrs. Basso's need for psychiatric care."

■■ The reasoning of the court in *In re Basso* is also applicable here. The testimony of the State's witnesses, as well as respondent's behavior in court, particularly his cross-examination of Mr. Swartz, clearly established that respondent believed that Hitler is still alive, and that respondent intended to act upon his belief by obtaining a weapon. The court could consider respondent's behavior at the hearing as evidence. (*In re Doe* (1978), 56 Ill. App. 3d 1052, 372 N.E.2d 866.) Respondent's statements to Mr. Swartz, Dr. Golchini and his parents also indicated that he planned to go to Las Vegas to bring Hitler to justice and was attempting to obtain a gun for this purpose. In light of the foregoing testimony, we conclude the evidence was overwhelming that the respondent was in need of mental treatment and that he was not prejudiced.

For the foregoing reasons, the judgment is affirmed.

Affirmed.

LINN and ROMITI, JJ., concur.