*In re* JANE DOE.—(THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, *v.* JANE DOE, Respondent-Appellant.)

First District (1st Division)    No. 77-688

Opinion filed January 9, 1978.

James J. Doherty, Public Defender, of Chicago (Judith A. Stewart, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Rimas F. Cernius, and James A. Hullihan, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

Respondent was asserted to be in need of mental treatment by a petition, supported by certification of two physicians, filed in the circuit court of Cook County. After an evidentiary hearing, the court found respondent to be in need of mental treatment and ordered her to be hospitalized by the Department of Mental Health. Respondent appeals from the finding and order of the court.

The sole issue on appeal is whether the State proved by clear and convincing evidence that the respondent was suffering from a mental disorder and, as a result of that disorder, was unable to care for herself. Respondent argues that (1) the testimony of the physician was not clear and convincing and (2) the trial judge based his finding on his conclusion that the respondent could not economically support herself, which is contrary to law.

Each of the two physician's certifications attested to the examining psychiatrist's conclusion that the respondent was in need of mental treatment. The first described the respondent's "multiple bizarre paranoid delusions" involving snakes and devils, and respondent's hostile and suspicious attitude. The second, prepared by Dr. Tahhri, reported that respondent was unable to care for herself, refused to tell her name and had delusions about snakes and devils in her house. The petition for hospitalization alleged that respondent had been picked up by the police while wandering about the Greyhound Bus Station. She was, at that time, "grandiose, delusional and hostile."

A hearing on the petition was held on May 10, 1976. The respondent asked to represent herself, but the court appointed the public defender to

assist in respondent's defense. Respondent waived a jury, stating that she was "no criminal" and did not need a jury.

Dr. Tahhri testified for the State that he had met with the respondent and tried to speak with her "about ten times" but that she refused to speak to him and was verbally abusive. He asked her a number of times to tell him her name, but she responded only once, saying her name was Miss Clark. The doctor attempted to give respondent a physical examination, but respondent swung at him and other staff members; therefore, respondent was restrained to enable the doctor to complete the examination. He found that she suffered from hypertension. She refused medication and kept telling him that people put snakes and devils in her house and some people came to her house and stole everything, which is why she went to the bus station.

The respondent here interjected her denial of the doctor's testimony. The court asked the respondent to wait her turn.

The doctor testified that he also considered in making his diagnosis that respondent claimed to be able to read minds and claimed she was in danger in the hospital. He observed that she always wore the same clothes, although she had other clothes with her, and that she wore a muffler about her face at all times. She would not tell him why she wore the muffler.

The respondent interrupted, stating that the witness was lying.

The doctor concluded that the respondent was suffering from the mental disease paranoia schizophrenia. The respondent stated, "I am suffering from nothing. I feel just fine. How can you get inside of me and say what I am suffering from. Where is your diploma and your degrees from?" She interrupted the next question with a statement, the general import of which was that she was not interested in others, she was interested only in her children and she wanted to go home to care for them.

The doctor testified that she could unintentionally harm other people, basing his opinion on the fact that she swung at the staff with her bag. She refused medication for treatment of her severe hypertension, and if she continued to refuse medication the doctor believed that she would deteriorate and "that can cause death." The respondent then declared that the doctor was "lying because they paying you * * *."

The doctor testified that respondent fed and dressed herself. He had no opinion about respondent's financial affairs, but his opinion was that she could not care for herself emotionally or physically. He recommended further treatment. Respondent interrupted again, saying that the doctor had been paid off and was working for the devil.

The court then asked the doctor if respondent could "care for herself" and the doctor answered, "Yes." The court asked if she could protect

herself from harm and the doctor said she might be able to, but that she was unable to function in society.

The respondent made a statement in which she explained that she had been restrained after "some people" had started a fight with her; that the doctor came in, and that she does not "associate" with people like the doctor who are unknown to her.

On cross-examination by the public defender, the doctor testified that the respondent did not attempt to strike him except while she was refusing the medical examination. She was put in restraints because she was refusing the physical. On redirect examination, the doctor stated that restraints were used as a last resort and that persons who refuse medical examination but are not violent are never restrained.

The State rested and the public defender moved for a directed finding, but was interrupted by the respondent saying that she felt fine. The court denied the motion, stating, "The State hasn't proved she is dangerous to herself or others. The question that bothers me is whether she can take care of herself."

The respondent, through the public defender, rested without testifying. The court inquired of the doctor, who told the court he had not been able to determine respondent's name or where she lived. The court then inquired of respondent, who replied, "I reside here in Chicago. I have been over here for over 20 years." She refused to be more specific.

The court continued to question respondent. She refused to speak about her children because their "lives would be in danger because the police won't protect me * * *." Later, she did say that she had five children, but refused to give even their first names to the court; the oldest child was "about twenty-some years" and the youngest was "6 or 7 years old, something like that."

The court asked how does she live and she responded that she had had a building "until they run me out of there, downtown on books and records * * *." She repeated her desire to be released to care for her children. The court asked where she would go "if we let you go?" She responded by demanding reimbursement for the loss of her property. The court asked where she would go if she were not reimbursed and she replied, "I have to be reimbursed." The court then stated:

> "All right. Okay. There will be a finding that the Respondent is in need of mental treatment and hospitalization.
>
> THE RESPONDENT: For wanting to take care of my children? Does your wife need mental health care?
>
> THE COURT: She will be hospitalized by the Department of Mental Health in a hospital which it designates. I cannot, in good conscience, allow this woman to go on the street. She can't cope with anything at the present time. She has no money.

THE RESPONDENT: I am not a resident of your country. You can't hold me.

THE COURT: By personally observing her actions in this courtroom. Now, what the Mental Health Code means by being able to take care of herself, it is only going to provide for her basics, but what is going to happen if this woman—can she go home, does she have money to support herself—

THE RESPONDENT: You can't hold me here no longer.

THE COURT: These are questions which enter my mind and these are questions which I think are problems which go to the Court whether she can take care of herself."

■■ A person is "in need of mental treatment" who is suffering from a mental disorder and who, as a result of the disorder, is reasonably expected to injure himself or others intentionally or unintentionally, or is unable to care for himself so as to guard himself from physical injury or to provide for his own physical needs. (Mental Health Code of 1967, section 1—11 (Ill. Rev. Stat. 1975, ch. 91½, par. 1—11).) The burden is on the State to prove that a respondent to an involuntary commitment petition is in need of mental treatment by clear and convincing evidence. *In re Stephenson* (1977), 67 Ill. 2d 544, 556, 367 N.E.2d 1273, 1278.

■■ From our review of the record, we are convinced that respondent was proved to be in need of mental treatment by clear and convincing evidence. The psychiatrist diagnosed respondent's mental disorder as paranoia schizophrenia. He was able to clearly indicate the basis for his diagnosis, having observed respondent and interviewed her several times. He pointed to respondent's behavior in continuously having her face covered, her inappropriate and irrational responses to questions and her delusions about hearing voices and being in danger from snakes and devils. On appeal, respondent does not challenge the conclusion that she was suffering from a mental disorder.

■■ Since the court specifically directed a finding at the close of the State's evidence that respondent was neither a danger to herself or others, the only grounds remaining for finding respondent to be in need of mental treatment was a finding that she was unable to care for herself so as to guard herself from physical injury or to provide for her own physical needs. We find that the evidence was clear and convincing that respondent was unable to care for herself. She refused medical treatment for severe hypertension, despite the doctor's warning that, if left untreated, the disorder could lead to death. This alone might be sufficient to establish that, as a result of her disorder, she could not care for herself. But the doctor was also of the opinion, based upon his examination of respondent, that she could not function in society, although she could clothe and feed herself. And, in addition, the court remarked that his

conclusion that respondent could not care for herself was influenced by his "personally observing her actions in this courtroom." As the trier of fact, he was clearly entitled to rely on the respondent's behavior and testimony in reaching his conclusion. *In re Stephenson* (1977), 67 Ill. 2d 544, 564, 367 N.E.2d 1273, 1281; *People v. Gerich* (1974), 22 Ill. App. 3d 575, 579, 317 N.E.2d 724, 728.

■■ Respondent points to the inconsistency in Dr. Tahhri's testimony, in which he first testified that respondent could not care for herself and then later testified, in response to a question from the court, that she could care for herself. While taken out of context these two responses are contradictory, taken in context and in light of subsequent clarifying answers given on redirect examination, the doctor's testimony was clear and convincing. *In re Sciara* (1974), 21 Ill. App. 3d 889, 316 N.E.2d 153, cited by respondent, is distinguished on its facts because there was not, in that case, any evidence in the record concerning an inability of the respondent to provide for her own physical needs. In the case at bar, the evidence that respondent refused medication was clear, convincing and uncontradicted.

■■ Respondent also argues, relying on some of the statements of the trial judge quoted above, that she was found unable to care for herself because she had no money, which is an economic condition and not the result of a mental disorder. While this issue need not be reached, because we have determined that respondent's neglect of her physical health was a sufficient showing of inability to care for herself, we note that it is relevant to determine whether a respondent has an understanding of money, or a concern for his or her lack of money or means of sustenance. (*In re Presswood* (1977), 51 Ill. App. 3d 104, 108, 366 N.E.2d 442, 444.) This is not to say that an indigent person who suffers from a mental disorder is *per se* in need of mental treatment; as respondent points out, there are many governmental and private charitable sources of funds for poor persons and it is impermissible to hospitalize someone merely to raise his or her standard of living. *O'Connor v. Donaldson* (1975), 422 U.S. 563, 45 L. Ed. 2d 396, 95 S. Ct. 2486.

■■ Here, where the State's witness and the court were unable to determine from the respondent if she had any place to live, any family who could assist her or any understanding or acceptance of her condition of physical ill-being, and where her mental disorder was clearly evident, the determination that she was in need of mental treatment and hospitalization is not tainted by the court's statement at the end of pronouncing judgment that "[s]he hasn't any money."

■■ Nor do we agree with respondent's contention that the trial judge impeached his own finding by his statements, quoted above, that he had questions about what would happen to the woman if she were released.

His statements do not imply that the questions were still unresolved in his mind at the time he pronounced judgment, as in *People v. Warren* (1976), 40 Ill. App. 3d 1008, 353 N.E.2d 250, nor was there any hesitation by the court in pronouncing judgment at the close of the evidence, as in *People v. King* (1973), 10 Ill. App. 3d 652, 295 N.E.2d 258. The statements of the court, we feel, are sensibly read to express to the parties some of the factors which entered into his judgment that respondent was in need of mental treatment, and not as expressions of doubt so as to indicate he was not sure of his judgment.

For all of the above reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

GOLDBERG, P. J., and McGLOON, J., concur.