*In re* JACQUELYN LONG, Alleged to be a Person Subject to Involuntary Admission (The People of the State of Illinois, Petitioner-Appellee, v. Jacquelyn Long, Respondent-Appellant).

Second District   No. 2—91—1406

Opinion filed November 19, 1992.—Rehearing denied December 30, 1992.

William E. Coffin, of Guardianship & Advocacy Commission, of Chicago, for appellant.

Gary V. Johnson, State's Attorney, of Geneva (William L. Browers and Marshall M. Stevens, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE WOODWARD delivered the opinion of the court:

Respondent, Jacquelyn Long, appeals from the order of the circuit court which found her to be a person subject to involuntary commitment and which committed her to the Department of Mental Health (Department). On appeal, respondent challenges the order on the bases that the trial court erred in finding that respondent was unable to provide for her basic physical needs, and the trial court failed to order the least restrictive treatment alternative.

Respondent previously was committed involuntarily to the Department. (See *In re Long* (1990), 203 Ill. App. 3d 357.) Evidently, re-

spondent had been released from the Department because she was a voluntary patient at the outset of these proceedings. On November 19, 1991, respondent requested to be discharged. (Ill. Rev. Stat. 1991, ch. 91½, par. 3—403.) The State responded with a petition for involuntary admission on the basis that respondent was unable to provide for her basic physical needs so as to guard herself from serious harm.

At the hearing, Dr. Garth Smith, a psychiatrist, testified that he diagnosed respondent as suffering from bipolar disorder, which was "at a mild manic phase." In a severely manic state, a person suffering from bipolar disorder will not sleep, rarely eats and is hyperactive. Respondent was sleeping well, but she had accelerated speech and was "quite impulsive." Dr. Smith characterized respondent as "very pleasant and agreeable and cooperative." Dr. Smith opined that respondent was unable to take care of herself because:

"Her inability to think about any problems make[s] her very impulsive. She is very likely to spend money unwisely and be impulsive in other kinds of ways with respect to her behavior as it relates to her illness."

Respondent had stopped taking her medication; she did not believe that she needed it, and she did not like lithium or sodium. According to Dr. Smith:

"[E]ven though she had taken it for some time and [it] had helped her.

With that thinking process, I think she is unable to help herself and take care of herself and exercise good judgment."

However, Dr. Smith admitted that respondent was able to clothe and feed herself, and she had adequate personal hygiene. Dr. Smith also admitted that there are some side effects to the medication prescribed for respondent, but he "was not apparently interested in" why she stopped taking the lithium since she was not taking it when Dr. Smith saw her. For the treatment plan, Dr. Smith recommended continued hospitalization of respondent and treatment with lithium and sodium.

Saul Sherter, the caseworker assigned to respondent, testified that respondent had a pattern of not complying with her medication regimen, which resulted in the appearance of symptoms and the inability to care for herself which, in turn, led to hospitalization. Sherter stated that respondent requested to be taken off medications which, in Sherter's opinion, were effective. Sherter explained that respondent had planned to go to Mississippi to live if she were released, but that the morning of the hearing respondent told Sherter that she intended to go to California to "surprise" her son who lives there. Respondent had $1,000 at her disposal, and, when Sherter suggested

that respondent put the money in a bank account, respondent told him "she would think about it."

Sherter related that there were discharge plans for respondent before she stopped taking her medication. Respondent was in a pre-placement interview at a halfway house when she told the interviewer "that she had tried to kill herself four or five times" and that she did not like the halfway house because "it could not meet her dietary requirements." After the interview at the halfway house, Sherter and respondent's then-treating psychiatrist discussed an independent discharge plan for respondent. However, this plan was dropped "because of Mrs. Long's increasingly symtomatic [sic] behavior and the fact that she declared openly that she had not been taking her medication, nor did she have any intentions of taking it *** in the future." The objectionable behavior respondent exhibited included "flight of ideas," i.e., "jumping from topic to topic, inappropriate emotional, effective [sic] reaction." According to Sherter, if respondent took her medication, then the discharge plans would proceed.

Respondent testified that the reason she was hospitalized was that she was warming her hands in the Bismarck Hotel in Chicago and someone called the police. The police brought her to an emergency room, and then she was transferred to Chicago-Read Mental Health Center. At the time, respondent had been living at the Pacific Garden Mission. Respondent stated that she was separated from her husband, and she intended to get a check from him for $1,900 that he owed her. In addition, respondent received from her husband $200 per month in maintenance. Respondent had worked as a secretary to put her husband through law school. Respondent could not remember when she worked the last time.

Respondent further testified that she stopped taking her medication because it made her physically ill. The lithium made her feet "bad," and the dietary menu at the Elgin Mental Health Center (EMHC) also contributed to her problems. When asked if she had a mental illness, respondent stated:

> "No, I am sane. I always have been. When they took my rights away at Forest Hospital, they took advantage of my husband's license. And the Judge said 'she looks pretty good to me.'
>
> And said to take it just for a month. I said no. And you ever have a fight with somebody and a doctor tells you to take a pill, I would rather go out and get drunk and smoke marijuana. I don't do either. And he took my rights away. And I have been controlled by a government agency ever since.

All they do is look at my identification and, bingo, I am in the nut house."

When asked what she intended to do with the check she already had, respondent answered, "Don't worry about my money. Worry about your own money." When further pressed about the money, respondent indicated that she might put it into an account, but that she "only got [*sic*] two outfits." Respondent did not want to live with her family, and she intended to live at various church shelters for the homeless.

Respondent stated that her preferred diet consisted of "[f]resh fruit, raw vegetables, eggs sunnyside up, cream butter, [and] Canadian water." Respondent further explained the negative side effects of lithium as causing blindness and gas, destroying blood vessels, and eliminating sodium.

The court found that respondent suffered from a mental illness. The court then stated:

> "I am concerned that her thinking has deteriorated to the point that it is not logical and systematic and that her judgment is impaired to the point that if she were released the court would believe that she would not be able to provide for her physical needs and would not be able to guard herself from serious harm."

The court agreed with the treatment plan and found that the least restrictive alternative for respondent was to remain hospitalized. Respondent timely appealed.

On appeal, respondent does not dispute the finding that she is mentally ill. Respondent contends, however, that the trial court's order must be reversed because the State did not prove by clear and convincing evidence that she was unable to provide for her basic physical needs so as to guard herself from serious physical harm.

■ The involuntary commitment procedure is founded on "society's obligation to protect and care for those who are unable to protect or care for themselves." (*In re Splett* (1991), 143 Ill. 2d 225, 230.) Because the involuntary commitment of a person entails the loss of that person's liberty, the State must show by clear and convincing evidence (Ill. Rev. Stat. 1991, ch. 91½, par. 3—808) not only that the person is mentally ill, but also that the person cannot provide for her basic physical needs so as to guard herself from harm. (See *Estate of Johnson v. Condell Memorial Hospital* (1988), 119 Ill. 2d 496, 504.) The evidence to support these findings must concern the respondent's current condition, and the decision to commit the respondent must be based on a fresh evaluation of her conduct and mental state. (*In re Houlihan* (1992), 231 Ill. App. 3d 677, 683.) The trial court's decision

regarding involuntary commitment is accorded great deference, and we will disturb that decision only if it is against the clear weight of the evidence. *In re Long* (1990), 203 Ill. App. 3d 357, 362-63.

Respondent argues that the State failed to prove that respondent could not survive safely on her own. As support for this argument, respondent assembled a list of factors for a court to consider when assessing whether a person is unable to provide for her physical needs because of a mental illness. Respondent relies on *In re Doe* (1978), 56 Ill. App. 3d 1052, and *In re Love* (1977), 48 Ill. App. 3d 517. The factors include whether: the respondent can obtain her own food, shelter, or necessary medical care (*Love*, 48 Ill. App. 3d at 521-22); the respondent has a place to live, or a family to assist the respondent (*Doe*, 56 Ill. App. 3d at 1058); the respondent is able to function in society (*Doe*, 56 Ill. App. 3d at 1057); and the respondent has an understanding of money or a concern for it as a means of sustenance (*Doe*, 56 Ill. App. 3d at 1058).

■ Generally, the inability to care for oneself so as to guard against physical harm is found when the illness substantially impairs one's "thought process[es], perception of reality, emotional stability, judgment, behavior, or ability to cope with life's ordinary demands." (*In re Ingersoll* (1989), 188 Ill. App. 3d 364, 368. See, *e.g., In re Tally* (1991), 215 Ill. App. 3d 385 (the respondent's apartment was bug-infested, filled with rotten food and disheveled; the respondent left his stove unattended, causing a pot to catch fire; and the respondent attempted to hail a bus by standing in front of it).) In a person suffering from the manic phase of bipolar disorder, this inability to care for oneself usually manifests itself by a failure to eat or sleep, to obtain proper medical care and by excessive activity to the point of exhaustion. See *In re Biggs* (1991), 219 Ill. App. 3d 361, 363.

Respondent argues that the State failed to prove that she was unable to survive on her own. Respondent points to her intention of seeking shelter in missions or church-run shelters or possibly staying with one of her sons. Respondent also asserts that she recognizes the need to eat and the value of money.

■ Contrary to the State's assertion, a person is free to live on the street, if the person chooses to do so. (See *In re Manis* (1991), 213 Ill. App. 3d 1075, 1078.) A person may not be held against her will merely to improve her standard of living or because society may find it uncomfortable to see such people on the street. (*O'Connor v. Donaldson* (1975), 422 U.S. 563, 575, 45 L. Ed. 2d 396, 407, 95 S. Ct. 2486, 2493-94.) However, if the person is incapable of feeding herself, she "will not be sent out to starve." *Manis*, 213 Ill. App. 3d at 1078.

■ In finding that respondent was a person subject to involuntary admission, the trial court relied on the opinions of the psychiatrist and the social worker that respondent exhibited poor judgment which hindered her ability to take care of herself. Although we agree with respondent that the refusal to take medication may be a rational decision (*Long*, 203 Ill. App. 3d at 363), the catch-22 here is that, by not taking any medication to alleviate her symptoms, respondent's judgment will become impaired as she goes through the cycle of mania and depression. Consequently, in such a situation, the refusal to take medication is not evidence of impaired judgment but the cause of it. Based on these facts, we cannot conclude that the trial court's judgment was against the manifest weight of the evidence.

We are concerned by the apparent unwillingness of the psychiatrist and the social worker to ascertain why respondent refused to take her medication. One of the goals of the Code and a fundamental rationale for the infringement of a person's liberty interests is to protect and care for those who cannot take care of themselves. (*In re Stephenson* (1977), 67 Ill. 2d 544, 554-55.) When the agents of the facility charged with caring for the patient fail to take adequate care of the patient, that goal is frustrated. Had either the psychiatrist or the social worker made the effort to figure out why respondent refused to take lithium, they would have learned that she suffered a toxic reaction to it. Presumably, then, the psychiatrist could have prescribed an alternate medication to correct the chemical imbalance in respondent's brain. Moreover, even though the psychiatrist did not know why respondent refused to take lithium, the refusal should have been a sufficient reason to prescribe a different medication for respondent. We suspect that, like the employees of the Department of Children and Family Services in *In re Ashley K.* (1991), 212 Ill. App. 3d 849, 872, it was easier for the psychiatrists to follow the path of least resistance in their treatment of respondent; to prescribe the "drug of choice" for her regardless of whether it is appropriate. The end result is that the system designed to aid one in need ends up harming her. See *Ashley K.*, 212 Ill. App. 3d at 873.

■ Respondent's second appellate contention is that the court erred in finding that hospitalization in the EMHC was the least restrictive treatment alternative. After a court determines that a person is subject to involuntary commitment, the court must order the respondent's placement in the least restrictive treatment alternative. Ill. Rev. Stat. 1991, ch. 91½, par. 3—811.

Respondent was adjudicated a person subject to involuntary admission under section 1—119(2) of the Code. (Ill. Rev. Stat. 1991, ch.

91½, par. 1—119(2).) That section expresses a preference for "some program other than hospitalization [to] meet the needs of such person with preference being given to care or treatment in his own community." (Ill. Rev. Stat. 1991, ch. 91½, par. 1—119(2).) Respondent argues that the State failed to present any alternatives to hospitalization. Respondent refers to the testimony regarding placement of respondent in a halfway house, but no decision was reached. Respondent also points to the social worker's failure to contact respondent's son in California to determine whether he could take in respondent.

The State responds that respondent rejected the halfway house option and any outpatient treatment because she thought she did not need it. These reasons are insufficient. Respondent's dislike of the halfway house is irrelevant to the court's decision of the least restrictive treatment alternative. Sections 3—811 and 3—812 of the Code govern alternative dispositions. Section 3—811 states that the court may order the respondent to undergo alternative treatment if the facility agrees to the placement (Ill. Rev. Stat. 1991, ch. 91½, par. 3—811), and section 3—812(a) limits the placement in an alternative treatment program only in that "[a]lternative treatment shall not be ordered unless the program being considered is capable of providing adequate and humane treatment which is appropriate to the respondent's condition" (Ill. Rev. Stat. 1991, ch. 91½, par. 3—812(a)); neither section requires that the respondent agree to the placement. The State presented no evidence that respondent had been rejected by any alternative treatment program.

The State relies on *In re Devine* (1991), 214 Ill. App. 3d 1, for the proposition that the least restrictive alternative is met when the State's experts opine that confinement in the EMHC is the least restrictive alternative for the respondent. We agree with respondent that the State's reliance on *Devine* is misplaced. *Devine* merely stated that the court is not required to make the explicit finding that the treatment ordered is the least restrictive alternative. *Devine*, 214 Ill. App. 3d at 7.

Respondent's treatment plan consisted of hospitalization in the EMHC and continued prescription of lithium and sodium. Since respondent refused to take those medications, and stated her insistence that she would continue to refuse to take them, respondent has no reasonable possibility of being discharged.

In light of the statutory preference for treatment other than hospitalization (see Ill. Rev. Stat. 1991, ch. 91½, par. 1—119(2)) and the psychiatrist's failure to determine whether another medication would be appropriate instead of lithium, we conclude that the trial court's

finding that hospitalization was the least restrictive alternative is against the manifest weight of the evidence. We therefore remand the cause to the trial court to conduct a hearing to determine whether alternate medication could be prescribed for respondent and whether any halfway house programs or other intermediate care facilities or alternate treatment are suitable for respondent.

The judgment of the circuit court is affirmed in part and reversed in part, and the cause is remanded with directions.

Affirmed in part; reversed in part and remanded with directions.

GEIGER and DOYLE, JJ., concur.