*In re* DIANE WINTERS, Alleged to be a Person Subject to Involuntary Admission (The People of the State of Illinois, Petitioner-Appellee, v. Diane Winters, Respondent-Appellant).

Second District   No. 2—92—1006

Opinion filed January 14, 1994.

WOODWARD, J., dissenting.

William E. Coffin, of Guardianship & Advocacy Commission, of Chicago, for appellant.

Paul A. Logli, State's Attorney, of Rockford (William L. Browers, David A. Bernhard, and Norbert J. Goetten, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE QUETSCH delivered the opinion of the court:

Respondent, Diane Winters, was found to be a person subject to involuntary admission and was ordered to be hospitalized with the Department of Mental Health. (Ill. Rev. Stat. 1991, ch. 91½, pars. 3—700, 3—811, 3—812 (now 405 ILCS 5/3—700, 3—811, 3—812 (West 1992)).) Respondent raises two issues for review: (1) whether the trial court's order for involuntary admission must be reversed because the State failed to prove by clear and convincing evidence that respondent was unable to provide for her basic physical needs so as to guard herself from serious harm; and (2) whether the trial court ordered the least restrictive treatment alternative.

On June 15, 1992, respondent voluntarily admitted herself to the H. Douglas Singer Mental Health Center (Singer). On July 23, respondent requested that she be released from Singer, and the State responded with a petition for involuntary admission. At the hearing on the petition on August 3, John LaRue, a registered nurse, testified that respondent was on his unit at Singer. According to LaRue, respondent was "confused" and "delusional." She insisted that she was pregnant, even after receiving negative pregnancy test results, and she refused medication. Respondent also was hostile when prevented from leaving the unit. On one occasion, respondent attempted to hit LaRue, but he blocked the blow. About two weeks before the hearing, respondent began saying that she was diabetic and she demanded insulin injections, although this behavior had subsided a few days before the hearing.

Daniel Figiel, a clinical social worker, testified that he examined respondent on July 31 and again on the day of the hearing. During

the first interview, respondent paced the room, and she had severe hand tremors. Respondent told Figiel that she "had racing thoughts real bad," that "she slept too much but then said she didn't sleep at all," and "she was exhausted from thinking too much." She also told him that "Hail Mary has been with her" and "a lot of women" had been in her thoughts. Respondent then said her mouth was dry and she did not want to answer any more questions. During the interview on the day of the hearing, respondent said "she was on camera with eyes at Singer"; she "said she was being the Hail Mary," and her "brains were being picked at by the staff at Singer." Respondent told Figiel that she was not ready to leave Singer because she had no place to live. Respondent did not know the day or date, but she knew she was in Singer. Figiel diagnosed respondent as suffering from schizophrenia, paranoid type, with marked delusions and confusion. Figiel did not examine respondent's medical charts.

Figiel opined that respondent was mentally ill and that she was reasonably expected to inflict serious physical harm on another in the near future. Figiel based this opinion on respondent's physical aggression when she attempted to leave the unit. Figiel further opined that respondent was unable to provide for her basic needs so as to guard herself from serious harm because of her mental illness. This opinion was based on respondent having no place to stay. Figiel also stated:

> "She is not able to care for herself, I don't believe, based on her illness, that she would have a great difficulty in taking care of her eating habits or eating. I don't think she would be able to sleep properly. She would get very confused and would not be able to function on a daily basis."

Respondent objected to this opinion as not having a sufficient basis. The court reserved ruling on the objection, subject to cross-examination.

On cross-examination, Figiel stated that he interviewed respondent on July 31 for 10 to 15 minutes and for 10 minutes before the hearing. During the interviews respondent was not threatening, she made no statements about eating, she was dressed appropriately, and her hygiene appeared adequate. Figiel had no evidence that respondent was not eating or sleeping properly.

Respondent renewed her motion to strike Figiel's testimony, which the court denied. Respondent presented no evidence. Several times during the hearing, respondent expressed that she was thirsty, and she was permitted to get a drink of water.

The court found that respondent was not likely to inflict serious harm on another. However, the court determined that respondent was unable to provide for her basic physical needs and was likely to cause serious harm to herself. The court noted respondent's belief that she was pregnant and diabetic. The court expressed concern that if respondent injected herself with insulin, she would cause serious harm to herself. Based on LaRue's testimony that the medical records did not indicate that respondent was diabetic, the court found that respondent's belief that she had diabetes resulted from her mental illness. The court further stated that the evidence was sufficient for an expert to conclude that respondent's delusions made it impracticable for her to determine what she should eat and what she should take for medication. The court conceded that there was no evidence about respondent not eating, but there was evidence she had no plans for living arrangements. Based on the dispositional evaluation, the court found that the least restrictive alternative was hospitalization. Respondent timely appealed.

Respondent first contends that the order of involuntary commitment must be reversed for lack of clear and convincing evidence that she was unable to provide for her basic physical needs so as to guard herself from serious harm.

The State cites *In re Grimes* (1990), 193 Ill. App. 3d 119, and *In re Williams* (1987), 151 Ill. App. 3d 911, to assert that the State does not need to prove that respondent is a definite danger to herself, and that a reviewing court should uphold a commitment order where there is a reasonable expectation that the respondent may engage in dangerous conduct. The State's reliance on these cases is misplaced because the trial court here did not find that respondent was a danger to herself or others. The court's decision was premised on its conclusion that respondent was unable to provide for her basic physical needs.

The involuntary commitment procedures implicate substantial liberty interests of the person, but these liberty interests must be balanced against the need to provide care for persons unable to care for themselves and to protect society from the dangerously mentally ill. (*In re Robinson* (1992), 151 Ill. 2d 126, 130-31.) This latter concern is not relevant here because the court found that respondent was not a danger to others. Respondent does not contest the finding that she is mentally ill, only the finding that her mental illness renders her unable to provide for her care and protection. (See Ill. Rev. Stat. 1991, ch. 91½, par. 1—119(2) (now 405 ILCS 5/ 1—119(2) (West 1992)).) The State had the burden to make this

showing by clear and convincing evidence, and we may not disturb the trial court's decision unless it is against the manifest weight of the evidence. (*In re Long* (1992), 237 Ill. App. 3d 105, 109-10.) A person may not be confined against her will merely because she is mentally ill if she is "dangerous to no one and can live safely in freedom." *O'Connor v. Donaldson* (1975), 422 U.S. 563, 575, 45 L. Ed. 2d 396, 407, 95 S. Ct. 2486, 2493.

To determine whether a person can provide for her basic physical needs, the court should consider whether: "the respondent can obtain her own food, shelter, or necessary medical care [citation]; the respondent has a place to live, or a family to assist the respondent [citation]; the respondent is able to function in society [citation]; and the respondent has an understanding of money or a concern for it as a means of sustenance [citation]." *Long*, 237 Ill. App. 3d at 110.

Respondent argues that the State failed to prove that she was unable to provide for her basic physical needs. Respondent points out that there was no evidence to support Figiel's opinion that respondent would not eat properly or would not sleep sufficiently. Although the trial court may determine the weight to accord an expert's opinion, that opinion must be more than conjecture or guess (*Dyback v. Weber* (1986), 114 Ill. 2d 232, 244). The weight to be assigned an expert's opinion depends on the factual basis for that opinion (*Treadwell v. Downey* (1991), 209 Ill. App. 3d 999, 1003), as an expert's opinion is only as valid as the reasons for it (*In re B.W.* (1991), 216 Ill. App. 3d 410, 414). We agree with respondent that Figiel's opinion should have been given little weight on this question because he never ascertained whether respondent was eating properly or whether she was sleeping an appropriate amount. In addition, the court cannot presume that a person suffering from schizophrenia will fail to eat or sleep or may engage in physical activity to the point of exhaustion. See *Long*, 237 Ill. App. 3d at 110; see also *In re Biggs* (1991), 219 Ill. App. 3d 361, 363.

The State emphasizes that the nurse, LaRue, testified that respondent believed that she was pregnant, that she was diabetic, she demanded insulin and she refused "anti-psychotic" medication. Figiel testified that respondent suffered from delusions and was confused; she was not oriented to day or date, and she told Figiel that she was not ready to leave Singer because she had no place to live.

Respondent first argues that she could not be committed merely because she refused to take psychotropic medication. The right to refuse such medication is guaranteed statutorily (Ill. Rev. Stat.

1991, ch. 91½, par. 2—107 (now 405 ILCS 5/2—107 (West 1992))), and it is not grounds for involuntary admission (*People v. Nunn* (1982), 108 Ill. App. 3d 169, 174; *In re Phillips* (1978), 62 Ill. App. 3d 408, 411). Thus, this fact will not support the trial court's finding.

Respondent also argues that she could not be committed involuntarily merely because she had no place to live. Figiel never discussed with respondent any living arrangements if she were to be released. There was no evidence that respondent did not have a place to stay temporarily. In addition, "[a] person may not be held against her will merely to improve her standard of living or because society may find it uncomfortable to see such people on the street." (*Long*, 237 Ill. App. 3d at 110, citing *O'Connor v. Donaldson* (1975), 422 U.S. 563, 575, 45 L. Ed. 2d 396, 407, 95 S. Ct. 2486, 2493-94.) Thus, this factor also fails to support the court's ruling.

The court based its finding on its concern that respondent would seek medical treatment for her imaginary pregnancy and diabetes. The court emphasized its concern that respondent *might* get insulin and cause herself serious harm. Respondent asserts that there was no evidence that her belief that she had diabetes was a delusion. Respondent correctly notes that no test was performed on her to determine whether she had developed diabetes, and the nurse merely stated that respondent did not have a history of diabetes. Respondent suggests that her frequent requests for water indicate a symptom of diabetes and that her belief that she was pregnant may have resulted from side effects of her medication which mimic symptoms of pregnancy. However, respondent did not raise these arguments in the trial court; therefore, they are waived. (*Saladino v. Team Chevrolet, Inc.* (1993), 242 Ill. App. 3d 735, 740.) Respondent further argues that, even if she were delusional in thinking that she was diabetic, there is no evidence that this delusion, or the delusion about pregnancy, would put her safety at risk. We agree.

Figiel did not testify that respondent might harm herself if she persisted in believing that she was pregnant or diabetic. These delusions were not part of Figiel's report, and it is unclear whether Figiel was aware of these delusions, as he did not examine her charts. Thus, the trial court's findings were not based on the evidence.

Moreover, the trial court assumed that respondent would be able to get insulin. This assumption presupposes that a physician would prescribe insulin for respondent without determining whether respondent is in need of it. According to the trial court's reasoning,

all hypochondriacs would have to be committed to the Department of Mental Health. Clearly, such is not the case. It is unreasonable to assume that any physician would prescribe insulin for respondent if she does not have diabetes. We conclude that the trial court's finding is against the manifest weight of the evidence and the order of involuntary commitment must be reversed. Consequently, we need not address respondent's second issue pertaining to treatment alternatives.

The judgment of the circuit court is reversed.

Reversed.

GEIGER, J., concurs.

JUSTICE WOODWARD, dissenting.

I respectfully dissent. In order to subject the respondent to involuntarily admission, the State must prove by clear and convincing evidence that the respondent is a person who is mentally ill and who, because of her illness, is unable to provide for her basic physical needs, so as to guard herself from serious harm. (Ill. Rev. Stat. 1991, ch. 91½, pars. 3—808, 1—119 (now 405 ILCS 5/3—808, 1—119 (West 1992)).) The reviewing court will normally uphold a commitment order where there is a reasonable expectation that respondent may engage in dangerous conduct. (*In re Williams* (1987), 151 Ill. App. 3d 911, 920.) The trial court's decision that the respondent is subject to involuntary admission will not be disturbed unless it is manifestly erroneous. *In re Long* (1992), 233 Ill. App. 3d 334.

The majority's attempt to rationalize the respondent's behavior is simply not convincing. John LaRue, a registered nurse who worked on the respondent's ward, opined that she could not guard herself against harm. He recounted some of respondent's persistent delusions, namely, that she was diabetic, though medical records showed otherwise, and that she was pregnant with three fetuses, despite negative pregnancy tests. The respondent had attempted to leave the hospital on numerous occasions, becoming angry and sometimes violent when restrained.

Daniel Figiel, a clinical social worker, examined respondent on July 31, 1992, and August 3, 1992, and filed a detailed report of his findings. Mr. Figiel testified that respondent suffers from paranoid schizophrenia, which manifests itself in marked delusions and confused thinking. His examination revealed a complex system of delu-

sional thought processes. During one examination, the respondent said that she believed a being referred to as "Hail Mary" has been with her on several occasions. She claimed to have been Hail Mary on one occasion. Additionally, the respondent believed that she was under continual observation by "a camera with eyes." She stated to Mr. Figiel that her brain is "picked at" by the Singer hospital staff.

Importantly, Mr. Figiel observed that the respondent was disoriented as to time and place. Further, she told him that she was not ready to leave Singer and had no place to live. Mr. Figiel found that the respondent had no ability to make realistic plans for herself. In his opinion, if she were allowed to leave the hospital, respondent's delusions would render her confused to the point where "she would not be able to function on a daily basis."

The trial court, upon observing the respondent at the hearing, stated:

"It is clear that she is suffering from a very active mental illness. The microphone couldn't even be pointed towards her because she felt that the electricity from it was going to affect her mentally. The speakers in the quiet room add static, according to her, which affected her mentally and other patients."

The testimony of Mr. LaRue and Mr. Figiel and the trial court's observations of the respondent's behavior provide ample support for the ruling that her behavior was so delusional that she could not take care of herself outside of the hospital setting.

The majority emphasizes the trial court's view that, if the respondent acted upon her delusions regarding diabetes and pregnancy, then she would put her safety at risk. Admittedly, acting on these delusions would probably not pose much risk to the respondent. Nevertheless, this distorted thinking does demonstrate her significant disorientation and serves to support the trial court's decision that she is unable to care for herself.

Also, the majority stresses that the evidence did not show respondent had no place to temporarily stay upon release. Yet the respondent stated to Mr. Figiel that she was not ready to leave Singer because she had no place to live. This *is* evidence of her lack of housing upon release. Given that testimony, it was incumbent upon the respondent to come forward with evidence that she did have a place to live.

In conclusion, the evidence clearly and convincingly demonstrates the following. At the time of the hearing, the respondent was floridly psychotic. She was delusional prior to the hearing and

at the hearing. The testimony of a nurse, who worked on respondent's ward, and the clinical social worker, who evaluated her mental condition, left no doubt that the respondent's paranoid schizophrenia substantially interfered with her ability to address the problems of daily life. Having observed the respondent's delusional behavior at the hearing and having listened to the testimony, the trial court's decision that the respondent, due to her active psychosis, was a danger to herself is not against the manifest weight of the evidence.