NO. 4-06-0947          Filed 9/5/07

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| In re: LILLIE M., a Person Found Subject to Involuntary Admission, | ) ) | Appeal from Circuit Court of |
| THE PEOPLE OF THE STATE OF ILLINOIS | ) | Sangamon County |
| Petitioner-Appellee, | ) | No. 06MH687 |
| v. | ) | |
| LILLIE M., | ) | Honorable |
| Respondent-Appellant. | ) ) | George H. Ray, Judge Presiding. |

_____

JUSTICE COOK delivered the opinion of the court:

Respondent, Lillie M., aged 43, appeals from the trial court's order finding Lillie subject to involuntary admission at St. John's Hospital (St. John's). At issue is whether the State presented sufficient evidence to prove that Lillie was unable to provide for her basic physical needs so as to guard herself from serious harm (405 ILCS 5/1-119(2) (West 2006)) and whether the court ordered the least-restrictive treatment alternative (405 ILCS 5/3-811 (West 2006)). We affirm.

I. BACKGROUND

According to Lillie's history and physical examination report, Lillie has a history of mental illness. This report also indicated that prior to the facts that gave rise to the instant case, Lillie had been seen by a physician, Dr. Bland, as recently as October 2, 2006. At that point in time, Lillie had been taking her medication and had been doing well. The report noted

that Lillie is also mildly mentally retarded, which may contribute to her inability to answer questions appropriately.

On October 23, 2006, family members brought Lillie to the emergency room after Lillie exhibited a change in behavior and difficulty functioning. Specifically, Lillie had cut her hair and began burning it in the sink. Lillie then ran away from the emergency room and returned to her apartment. Lillie locked herself in the bathroom with a pair of scissors and cut more hair, this time putting it in the toilet.

Police officer C. Agans-Dominguez arrived at Lillie's apartment to find Lillie with a bizarre haircut and the toilet full of hair. Lillie was pacing the apartment and did not respond to Agans-Dominguez's questions. Lillie's family expressed a concern for Lillie's well-being and told Agans-Dominguez that Lillie earlier stated that "people put stuff in her house." Agans-Dominguez then filed a petition for involuntary admission, reporting what he had just seen at Lillie's residence. The petition alleged that Lillie could be reasonably expected to harm herself or others due to her mental illness and that Lillie appeared unable to take care of her own basic physical needs.

On October 27, 2006, the trial court held a hearing on the petition for involuntary admission. The only issue at the hearing was whether Lillie would be unable to care for her basic

physical needs.  Lillie and Dr. Laura Shea, a psychiatrist, were the only two witnesses.

Dr. Shea testified that she had been a psychiatrist for 16 years and had first met and examined Lillie the morning after her admittance, October 24, 2006.  Dr. Shea also examined Lillie's medical chart.  Dr. Shea noted that Lillie had been diagnosed with chronic paranoid schizophrenia or chronic undifferentiated schizophrenia.  Dr. Shea stated that Lillie's medical history indicated that she had been "disabled" by schizophrenia in the past.  Dr. Shea stated that, during the interview, Lillie had been "too determined" to say that "nothing was wrong." Lillie's facial expression was very hard and Lillie stared at Dr. Shea.  Dr. Shea recounted the hair-cutting incident that had been described in the petition and was contained in hospital records. Dr. Shea stated that Lillie was not assertive in finding out how Lillie's seven-year-old daughter was faring in Lillie's absence. Dr. Shea stated that Lillie had been showering daily, though she was not certain that was due to Lillie's own initiative.  Lillie initially refused food, telling Dr. Shea that the hospital had "done something to it."  On at least two occasions, Lillie asked for food but then would refuse to eat it.  However, Dr. Shea stated that Lillie had been eating pretty well over the last several days.

Dr. Shea stated she believed with a reasonable degree

of psychiatric certainty that Lillie, due to her mental illness, would be unable to provide for her physical needs so as to guard herself from serious physical harm. 405 ILCS 5/1-119(2) (West 2006). Dr. Shea was aware that the petition originally alleged that Lillie could be reasonably expected to harm herself or others (405 ILCS 5/1-119(1) (West 2006)), but Dr. Shea did not certify that allegation.

Dr. Shea recommended that commitment at St. John's for a period not to exceed 90 days was the least-restrictive treatment alternative. Specifically, Dr. Shea testified that she supported the treatment plan prepared by St. John's. That treatment plan stated that, prior to Lillie's admittance to the emergency room, Lillie had been living with her adult sister and had been "current with the Mental Health Center" and had seen Dr. Bland. The plan's discharge strategy included a referral back to the "Mental Health Center" and outpatient treatment once Lillie demonstrated an ability to care for herself. The estimated length of stay at St. John's was one week. At the hearing, Dr. Shea further stated:

> "Could we have [Lillie stay at St. John's]
> but have leave to transfer her to McFarland
> if we need to? I'd like to see [Lillie]
> discharged from [St. John's] if we can since
> she's taken her medicine for two days. I'm

not sure how to handle that."

In addition to the petition, which stated it appeared Lillie did not take care of herself and mentioned family members' concern for Lillie's well-being, Dr. Shea based her conclusion that Lillie needed to be admitted on Lillie's "basic paranoia." Dr. Shea worried that if Lillie did not trust her family or other care providers, Lillie would not be able to get shelter, food, medicine, or other necessary care. Dr. Shea would like to see evidence that Lillie's paranoia had cleared before Lillie left St. John's.

Lillie testified that she lived alone with her seven-year-old daughter. However, emergency-room records indicate that Lillie also lives with her adult sister. Lillie has also told hospital staff that she lives with her mother. Lillie stated that she wanted to cut her hair short for a change, she had merely flushed her hair down the toilet, and she had not burned her hair in the sink. When asked why she put her hair in the toilet, Lillie answered, "I didn't have nowhere else to put it. I didn't want nobody doing nothing to it."

Lillie stated that, since admission into St. John's, she has been showering and brushing her teeth daily. When asked how frequently she has been eating, Lillie stated, "Off and on, but--well, you might as well say every day." When asked on cross-examination if she felt someone at the hospital was trying

to poison her food, Lillie answered, "I don't know who to trust." Lillie later contradicted these statements by saying, "I eat my food all the time," and denying that she thought anyone was trying to poison her. Lillie also stated that she took her medication "sometimes" and did not feel like she needed it. Lillie indicated that she did not plan on taking her medication once home.

The transcripts reflect that Lillie often responded to questions in an odd or inappropriate manner. For instance, when asked what she did with her hair, Lillie stated, "Yeah, I flushed it down the toilet. I swore on my bible." When asked whether she cooked meals for her daughter, Lillie answered, "Yeah, I cook. Cook, clean, wash, mop. Go for walk." Lillie also interrupted and spoke out of turn three times during the proceedings. Further, the history and physical examination report indicated that Lillie was often "completely unreliable" in providing information.

After closing argument, the trial court stated it found by clear and convincing evidence that Lillie suffered from mental illness, and as a result of that illness could not take care of her basic needs. The court did not explain its finding further, but it ordered Lillie to remain hospitalized at St. John's Hospital for a period not to exceed 90 days. The court found this to be the least-restrictive alternative. The trial court's

written order only mentioned commitment at St. John's and did not mention the possibility of a transfer. On October 31, 2006, Lillie filed the instant appeal. On November 3, 2006, over Lillie's objection, the trial judge signed an order transferring Lillie to McFarland Mental Health Center under section 3-908 of the Mental Health and Developmental Disabilities Code (405 ILCS 5/3-908 (West 2006)). Aside from the trial court's order, the record contains no further information regarding the transfer.

## II. ANALYSIS

Lillie argues that (1) clear and convincing evidence did not warrant involuntary admission, and (2) involuntary admission did not constitute the least-restrictive treatment alternative. 405 ILCS 5/3-811 (West 2006). The State has the burden of proving the need for involuntary admission by clear and convincing evidence. In re Schumaker, 260 Ill. App. 3d 723, 727, 633 N.E.2d 169, 172 (1994). Because the trial court is in the best position to weigh the evidence and determine the credibility of the witnesses in an involuntary admissions proceeding, the trial court's decision "'will not be set aside at the appellate level, even if the reviewing court, after applying the clear and convincing standard, would have ruled differently' [citation], unless it is against the manifest weight of the evidence." In re Bennett, 251 Ill. App. 3d 887, 888, 623 N.E.2d 942, 944 (1993), quoting In re Orr, 176 Ill. App. 3d 498, 505, 531 N.E.2d 64, 69

(1988).

Lillie argues that even if she were mentally ill, the State did not prove that she was unable to care for her own basic physical needs. A mentally ill person cannot be confined against her will merely because she suffers from a mental illness if she can live safely in freedom. In re Tuman, 268 Ill. App. 3d 106, 110, 644 N.E.2d 54, 58 (1994). A person with a mental illness is, however, subject to involuntary admission where she, because of her mental illness, is unable to provide for her basic physical needs so as to guard herself from serious harm without the assistance of family or outside help. 405 ILCS 5/1-119(2) (West 2006). "[The] illness must prevent her from caring for her basic physical needs by substantially impairing her thought process, perception of reality, emotional stability, judgment, behavior, or ability to cope with life's ordinary demands." In re Ingersoll, 188 Ill. App. 3d 364, 368, 544 N.E.2d 409, 412 (1989). In determining whether a person can provide for her basic physical needs under section 1-119(2), the court should look to whether the person can obtain her own food, shelter, and medical care, whether the person has a place to live or family to assist her, whether she can function in society, and whether the person has an understanding of money as a means of sustenance. In re Rovelstad, 281 Ill. App. 3d 956, 968, 667 N.E.2d 720, 727 (1996) (Second District). The court may look to evidence of a person's

repeated past pattern of specific behavior and actions related to that person's illness. 405 ILCS 5/1-119 (West 2004). Similarly, the court is not required to wait until actual harm results before hospitalization is warranted. In re Manis, 213 Ill. App. 3d 1075, 1077, 572 N.E.2d 1213, 1214 (1991).

Here, the State's evidence that Lillie could not take care of her physical needs consisted largely of Dr. Shea's observations and Dr. Shea's interpretation of the facts contained in the petition and medical report. While the underlying factual support of the testifying expert's opinion need not, as a matter of law, be substantively admissible, the expert's opinion must be supported by a sufficient factual basis to render it clear and convincing. Tuman, 268 Ill. App. 3d at 110-11, 644 N.E.2d at 59; see also In re Cutsinger, 186 Ill. App. 3d 219, 223-24, 542 N.E.2d 414, 417 (1989) (medical opinion was not clear and convincing where expert, without reference to any factual basis, merely gave the opinion that the patient could not care for basic physical needs). In balance, we are mindful that "[diagnosis and treatment of a mental disorder] is a highly specialized area of medicine which is better left to the experts ***. In the absence of a reason to the contrary, [the] physician's diagnosis and treatment plan of hospitalization should be given credence and followed." Ingersoll, 188 Ill. App. 3d at 368, 544 N.E.2d at 412; see also In re C.E., 161 Ill. 2d 200, 229, 641 N.E.2d 345,

- 9 -

358 (1994) (different issue).

Though Lillie's medical records prior to the instant occurrence are not part of the record, Dr. Shea testified that Lillie had a history of being "disabled" by her schizophrenia. After observing Lillie and witnessing her "basic paranoia," Dr. Shea did not believe Lillie would be able to ask others for the help she needed to secure her physical well-being. It is clear that Lillie suffered from paranoia. Dr. Shea testified that Lillie had stated that "something had been done to [the food at the hospital]." At the hearing, when asked if anybody at the hospital was trying to poison her food, Lillie answered "I don't know who to trust." When asked why she put her hair in the toilet, Lillie explained that she "didn't want nobody doing nothing to it."

We recognize that, in Rovelstad, the court found that evidence that a person has paranoid or delusional thoughts absent evidence that a person is reasonably likely to act on those thoughts to her own detriment is insufficient to warrant an involuntary admission. Rovelstad, 281 Ill. App. 3d at 970, 667 N.E.2d at 728-29. However, the instant case is distinguishable from Rovelstad. In Rovelstad, the respondent testified that he heard voices that told him to run around naked, to stop eating and sleeping, and to commit suicide. Rovelstad, 281 Ill. App. 3d at 970, 667 N.E.2d at 728. Evidence suggested that the respon-

- 10 -

dent acted on odd beliefs in the past. For instance, the respondent had marked doorways and household items with mineral oil for "protection" because he believed mineral oil to be blessed. Rovelstad, 281 Ill. App. 3d at 960, 667 N.E.2d at 722. However, the court held that because the respondent had never acted or attempted to act in response to the voices telling him to run around naked, stop eating and sleeping, and commit suicide, it was against the manifest weight of the evidence for the trial court to find that the respondent was unable to care for his basic physical needs. Rovelstad, 281 Ill. App. 3d at 970, 667 N.E.2d at 728-29.

In contrast, Lillie did act upon potentially harmful paranoid thoughts. Lillie believed that hospital staff had been tampering with her food, and Dr. Shea testified to at least two occasions where Lillie had ordered food and then refused to eat it. Similarly, Lillie held the unrealistic belief that "someone" would "do something" to her hair, and so Lillie acted by disposing of it in an odd and potentially dangerous manner. True, these actions are not extreme in the sense that they were guaranteed to cause harm. However, as stated above, the court does not need to wait until actual harm results. Moreover, to the extent that the Second District in Rovelstad implied that the facts must show the respondent acted upon dangerous beliefs or delusions (a voice that tells a person to commit suicide), as opposed to

- 11 -

harmless beliefs or delusions (mineral oil provides protection), we simply disagree. To hold as much would not give the medical expert the ability to properly treat and diagnose nuanced and "abstract" symptoms of those they believe to be dangerously afflicted. See Ingersoll, 188 Ill. App. 3d at 368-69, 544 N.E.2d at 412.

Here, Dr. Shea, in her 16 years of experience, believed that Lillie would be unable to physically care for herself, the trial court agreed, and we cannot say that an opposite finding is clearly apparent.

Finally, Lillie argues that the State failed to prove that involuntary admission to St. John's was the least-restrictive alternative. If a person is subject to involuntary admission, the court is required to order the least-restrictive treatment that is appropriate. 405 ILCS 5/3-811 (West 2006). In addition to hospitalization, the court may also consider outpatient treatment or placement in the care of a relative. A statutory preference exists for treatment other than hospitalization, and therefore the court may order hospitalization only where it has been shown to be the least-restrictive treatment alternative. In re Nancy A., 344 Ill. App. 3d 540, 556, 801 N.E.2d 565, 580 (2003).

Case law is somewhat split on exactly how much evidence is required to support a finding that a given treatment is the

least-restrictive alternative. In In re Devine, 214 Ill. App. 3d 1, 7, 572 N.E.2d 1238, 1242 (1991), the Second District held that the trial court's failure to specify in its order of commitment that the admission constituted the least-restrictive means of treatment was not fatal where the State's primary witness responded affirmatively when asked whether hospital confinement constituted the least-restrictive treatment. But see In re Long, 237 Ill. App. 3d 105, 112, 606 N.E.2d 1259, 1264 (1992) (Second District, stating that Devine only stands for the proposition that the court is not required to make an explicit finding that the treatment is the least-restrictive alternative and not that the least-restrictive alternative requirement is met when an expert merely opines that it is such). Other courts have required more than an expert's statement at hearing that the proposed treatment is the least-restrictive alternative, requiring that the expert's opinion be supported by further explanation. See Long, 237 Ill. App. 3d at 112, 606 N.E.2d at 1264 (Second District); In re Lawrence S., 319 Ill. App. 3d 476, 484, 746 N.E.2d 769, 776 (2001) (Second District); In re Luttrell, 261 Ill. App. 3d 221, 227, 633 N.E.2d 74, 78-79 (1994) (Fourth District).

The instant case is distinguishable from Lawrence S. and Luttrell. In those cases, the State did not present a written treatment plan. Lawrence S., 319 Ill. App. 3d at 484,

- 13 -

746 N.E.2d at 775; <u>Luttrell</u>, 261 Ill. App. 3d at 226, 633 N.E.2d at 78. Further, in <u>Luttrell</u>, the expert who merely opined the treatment was the least-restrictive alternative, without explanation or discussion of other treatment options, was contradicted by another expert who had investigated the possibility that the patient could stay with a relative. <u>Luttrell</u>, 261 Ill. App. 3d at 226-27, 633 N.E.2d at 78. Here, Dr. Shea's opinion that hospitalization was the least restrictive alternative did not "stand alone" (<u>Luttrell</u>, 261 Ill. App. 3d at 227, 633 N.E.2d at 78) in the same way that the experts' opinions in <u>Lawrence S.</u> and <u>Luttrell</u> stood alone. Compare <u>Lawrence S.</u>, 319 Ill. App. 3d at 484, 746 N.E.2d at 776. Dr. Shea endorsed the treatment plan, which recognized that Lillie had a supportive family and had previously worked with Dr. Bland at the "Mental Health Center." Despite these alternative treatment options, Dr. Shea still recommended hospitalization, stating that she would like to see Lillie's paranoia cleared before Lillie left the hospital. Without such supervision, Dr. Shea was afraid that Lillie would not be able to properly care for herself.

Further, the evidence in this case supports hospitalization. Lillie does apparently have a supportive family. However, ordering Lillie to reside with her family while undergoing outpatient treatment does not seem like a reasonable treatment alternative because that appears to be the treatment Lillie

- 14 -

was receiving before her family brought her to the emergency room. See In re David D., 307 Ill. App. 3d 30, 34, 716 N.E.2d 1245, 1248-49 (1999) (respondent's aunt's offer to care for respondent was not a reasonable treatment alternative where respondent's aunt had been caring for respondent until respondent ran away and respondent's aunt later brought respondent in for treatment because she felt she could not manage respondent). Accordingly, the State presented sufficient evidence that involuntary admission to St. John's was the least-restrictive treatment alternative.

### III. CONCLUSION

For the aforementioned reasons, we affirm the trial court's order.

Affirmed.

STEIGMANN, P.J., concurs.

KNECHT, J., dissents.

- 15 -

JUSTICE KNECHT, dissenting:

The State failed to present sufficient evidence to prove the mentally ill respondent was unable to provide for her basic physical needs so as to guard herself from serious harm. There is likely more evidence that could have been presented, but the State took the oft-used shortcut of having only the psychiatrist testify.

A history of mental illness, an odd haircut, and a degree of paranoia may be enough to suggest respondent would benefit from treatment, but it does not prove by a clear-and-convincing standard that she needs to be involuntarily committed.

Some staff at St. John's believed she would be discharged to her home with follow-up outpatient treatment. Even the psychiatrist believed she would stay at St. John's for no more than one week. Yet just days after the hearing, respondent was ordered transferred to McFarland Mental Health Center by the trial court even though the order of October 27, 2006, found St. John's was the least-restrictive alternative. The transfer is curious, but that issue is not before us.

This court has commented with some frequency on procedural deficiencies in mental-health cases. Those deficiencies and mistakes sometimes do not require reversal. However, they suggest a lack of attention to process. This case, where I contend the evidence is lacking, suggests a failure to understand

the quality and quantity of evidence required to meet the high burden of proof in such cases.