*In re* STANLEY ROVELSTAD, JR., Alleged to be a Person Found Subject to Involuntary Admission (The People of the State of Illinois, Petitioner-Appellee, v. Stanley Rovelstad, Jr., Respondent-Appellant).

Second District Nos. 2—95—1000, 2—95—1145 cons.

Opinion filed June 28, 1996.

Teresa L. Berge, of Rockford, Barbara J. Sosin, of Hines, and John B. Lower and William E. Coffin, both of Chicago, all of Guardianship & Advocacy Commission, for appellant.

David R. Akemann, State's Attorney, of St. Charles (William L. Browers, Robert J. Biderman, and Jeffrey K. Davison, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE BOWMAN delivered the opinion of the court:

Respondent, Stanley Rovelstad, Jr., appeals two orders entered by the trial court pursuant to the Mental Health and Developmental Disabilities Code (Code) (405 ILCS 5/1—100 *et seq.* (West 1994)). The first, entered on July 28, 1995, ordered him admitted involuntarily to St. Joseph's Hospital (St. Joseph's) for 30 days on the basis that he was mentally ill and unable to provide for his basic physical needs so as to guard himself from serious harm. See 405 ILCS 5/1—119(2) (West 1994). The second, entered on August 25, 1995, ordered the extension of his hospitalization for an additional 30 days. See 405 ILCS 5/3—813 (West 1994). Respondent filed separate timely notices of appeal and this court consolidated the two cases.

## FACTS

The following summary of the relevant facts is taken from the record on appeal. On July 19, 1995, respondent's father, Stanley Rovelstad, Sr. (Stanley, Sr.), filed a petition to involuntarily admit respondent pursuant to article VI of the Code (405 ILCS 5/3—600 *et seq.* (West 1994)). The petition stated that respondent had a history of schizophrenia and was delusional, paranoid, expressing morbid thoughts, and behaving abnormally.

Attached to the petition was a certificate executed by an emergency room physician pursuant to section 3—602 of the Code (405 ILCS 5/3—602 (West 1994)). The certificate stated that respondent was in need of hospitalization based on his history of schizophrenia, poor hygiene, and refusal to answer questions. The certificate also stated that respondent "[c]ould be hallucinating and thus dangerous."

A hearing on the petition took place on July 28, 1995. Immediately prior to the start of the hearing, respondent's counsel stated, in response to questions by the trial court, that there was no issue as to the validity of service, the timeliness of the hearing, or compliance with section 3—602.

At the hearing, Stanley, Sr., testified first. He stated that respondent lived with him until mid-July 1995, when respondent began behaving abnormally. According to Stanley, Sr., respondent "decided

that he didn't need anyone anymore." Stanley, Sr., believed that this "sounded sort of ominous" and felt that "something could happen" as a result. On July 18, 1995, respondent told Stanley, Sr., that voices told him to go to the mall and play the banjo. Stanley, Sr., testified that respondent is a religious person, although he does not practice an established religion. Respondent also uses mineral oil, which he considers blessed, to mark doorways, steps, bedclothes, and furniture for protection. On cross-examination, Stanley, Sr., conceded that the amount of mineral oil respondent placed around the house only amounted to about a cupful and that it did not harm anything.

Dr. Conchita Gavinon, a psychiatrist, also testified. She stated that she performed a psychiatric examination of respondent after his admission to St. Joseph's, but did not state when this examination occurred. The examination consisted of reviewing medical records and speaking to respondent and members of his family. After performing this examination, Dr. Gavinon diagnosed respondent as suffering from schizophrenic disorder, undifferentiated type, which is considered a mental illness. She explained that the symptoms of this illness include auditory and/or visual hallucinations, delusions, inability to talk in a codirective manner, and a blunted or inappropriate affect.

Dr. Gavinon further stated that respondent is suspicious and hears voices. She stated that during one conversation he said that he was sent to the hospital by his father and other members of his family so they could deprive him of his inheritance. He also told Dr. Gavinon he did not need to be in the hospital and that he did not believe in doctors, dentists, or medications. During another conversation, respondent accused Dr. Gavinon of being against him and of working with Stanley, Sr.

Dr. Gavinon opined that respondent was mentally ill and that, because of this illness, he was unable to provide for his basic physical needs so as to guard himself from serious harm. She based this opinion on his refusal to shower, bathe, or change his clothes while he was at St. Joseph's, his tendency to isolate himself in his room, and his refusal to take medication. She further opined that, in his current condition, he could not maintain employment because he has "distorted beliefs about different things." She also stated that in an unstructured environment respondent would not be able to take care of his basic living functions.

Finally, Dr. Gavinon stated that St. Joseph's was the least restrictive environment available for respondent and that a treatment plan had been developed for him. The goal of the treatment plan was to stabilize respondent's condition by reducing his hallucinations, thus helping him to have a more realistic view of things. Dr. Gavinon

stated that, with medication, respondent could achieve this goal in one to two weeks.

On cross-examination, Dr. Gavinon admitted that, although she considered respondent's reluctance to talk to her evidence of irrational suspicion, he had no legal obligation to speak to her. She also conceded that she did not know what effect his commitment would have on his property rights. She also conceded that he might be able to find shelter on his own.

After hearing the above evidence, the trial court found that respondent was mentally ill and that, as a result of his illness, he was unable to provide for his basic physical needs so as to guard himself from serious harm. See 405 ILCS 5/1—119(2) (West 1994). In so finding, the trial court highlighted Dr. Gavinon's testimony that respondent had refused to bathe or change his clothes for several days while at St. Joseph's. The trial court also found that St. Joseph's was the least restrictive environment in which to place respondent. Accordingly, the trial court ordered respondent hospitalized for a period not to exceed 30 days.

On August 8, 1995, St. Joseph's filed a petition to transfer respondent to the Elgin Mental Health Center (EMHC), asserting that he had failed to thrive at St. Joseph's and had refused to take medication or participate in therapy. The trial court conducted a hearing on the matter. At the hearing, respondent testified that he has heard voices since 1976; these voices have told him to run around naked, to stop eating and sleeping, and to commit suicide. Following the hearing, the trial court granted this petition, and respondent was transferred to EMHC on or about August 21, 1995.

On August 23, 1995, four days prior to the expiration of the order for respondent's involuntary admission, the Department of Mental Health filed a document entitled "motion to modify commitment order," purportedly pursuant to section 3—813 of the Code (405 ILCS 5/3—813 (West 1994)). The motion stated that respondent had derived little benefit from his treatment at St. Joseph's and that it was too early to determine the effect of a new treatment plan implemented by EMHC. Accordingly, the motion sought an extension of respondent's period of hospitalization until September 29, 1995.

On August 25, 1995, the trial court held a hearing on the "motion to modify commitment order." Respondent's counsel objected to the hearing on the basis that the period of hospitalization could not be extended without a "recommitment hearing." The trial court overruled this objection and proceeded.

Dr. Jules Michel, a psychiatrist at EMHC, testified first. He stated that respondent arrived at EMHC in a psychotic state, but did not of-

fer a diagnosis of respondent's mental illness. He explained that his contact with respondent in the four days since his arrival at EMHC had been limited, but stated that respondent appeared to be "very, very slightly" better. Finally, Dr. Michel stated that respondent had been compliant with the treatment at EMHC, which consisted of medication and counseling.

Respondent also testified on his own behalf. He explained that he was taking his medication and cooperating with treatment because he was being forced to do so. He stated that, if released, he would cease taking medication because he did not need it. Finally, he stated that he was sane and that he did not want his hospitalization to continue.

After hearing the above testimony, the trial court "grant[ed] the State's motion to extend the [hospitalization] period for an additional 30 days." Respondent then filed this timely appeal.

## RELEVANT STATUTORY PROVISIONS

■ Before addressing respondent's specific contentions of error, we provide the following brief overview of the relevant provisions of the Code. The petition for involuntary admission at issue in this case was filed pursuant to article VI of the Code, entitled "Emergency Admission by Certification." Sections 3—600 and 3—601 of the Code provide that a person 18 years of age or older who is "subject to involuntary admission" may be admitted pursuant to a petition. 405 ILCS 5/3—600, 3—601 (West 1994). Section 1—119 of the Code defines a person "subject to involuntary admission" as, *inter alia*, a person with mental illness who because of his illness is unable to provide for his basic physical needs so as to guard himself from serious harm. 405 ILCS 5/1—119(2) (West 1994).

A petition for involuntary admission must include, *inter alia*, a detailed statement of the reason that the respondent is subject to involuntary admission and the name and address of the respondent's spouse, parent, guardian, or close relative. 405 ILCS 5/3—601 (West 1994). If the petitioner is unable to supply this information, he must state that a diligent inquiry was made to learn this information and supply a detailed account of this inquiry. 405 ILCS 5/3—601(b)(2) (West 1994).

Section 3—602 requires that the petition be accompanied by a certificate executed by a physician, qualified examiner, or clinical psychologist which states that the respondent is subject to involuntary admission and requires immediate hospitalization. 405 ILCS 5/3—602 (West 1994). The certificate must include clinical information and supporting facts. 405 ILCS 5/3—602 (West 1994).

Section 3—610 states that a psychiatrist must examine the respondent no later than 24 hours after he is admitted. 405 ILCS 5/3—610 (West 1994). The psychiatrist who conducts this examination must execute a certificate similar to that required by section 3—602 and may not be the same individual who executed the first certificate. 405 ILCS 5/3—610 (West 1994). Section 3—610 further provides that, if no examination occurs within 24 hours of admission or if the examining psychiatrist does not execute a certificate, "the respondent shall be released forthwith." 405 ILCS 5/3—610 (West 1994).

Article VIII of the Code, which governs court hearings, is also relevant to several issues raised in this appeal. Section 3—810 provides that before the trial court orders involuntary admission in a particular case the director of the facility or another person designated by the court must prepare a written dispositional report. 405 ILCS 5/3—810 (West 1994). The dispositional report is to contain information regarding the appropriateness of alternative treatment settings, a social investigation of the respondent, and a preliminary treatment plan. 405 ILCS 5/3—810 (West 1994). The treatment plan must describe the respondent's problems and needs, treatment goals, proposed treatment methods, and a projected timetable for their attainment. 405 ILCS 5/3—810 (West 1994).

Section 3—813 prescribes the method by which the State must proceed if it wishes to extend a respondent's period of involuntary admission. To extend a period of involuntary admission, the facility director must file, prior to the expiration of the initial admission order, a new petition supported by two new certificates and a current treatment plan. 405 ILCS 5/3—813 (West 1994). The respondent must be discharged if no new petition is filed prior to the expiration of the initial order. 405 ILCS 5/3—813 (West 1994). Finally, section 3—808 provides that no respondent may be found subject to involuntary admission unless that finding is established by clear and convincing evidence. 405 ILCS 5/3—808 (West 1994).

## DISCUSSION

On appeal, respondent launches a broad attack on the propriety of both the trial court's July 28, 1995, order finding him subject to involuntary admission and its August 25, 1995, order extending the period of his involuntary admission. First, respondent contends the July 28, 1995, order must be reversed because (1) the State failed to provide him with a psychiatric examination within 24 hours of his hospitalization or file a second certificate executed by a psychiatrist, as required by section 3—610 of the Code (405 ILCS 5/3—610 (West 1994)); (2) the State neither named his guardian in the petition nor

informed him of the hearing, as required by section 3—601(b) of the Code (405 ILCS 5/3—601(b) (West 1994)); (3) the State failed to file a written dispositional report as required by section 3—810 of the Code (405 ILCS 5/3—810 (West 1994)); and (4) the State failed to prove by clear and convincing evidence that he was subject to involuntary admission. Respondent also contends that the trial court's August 25, 1995, order extending his involuntary admission must be reversed because the State failed to file a new petition for involuntary admission supported by two certificates as required by section 3—813 of the Code (405 ILCS 5/3—813 (West 1994)).

We conclude that the State's failure to provide respondent with a psychiatric examination within 24 hours of his admission and to file a second certificate, as required by section 3—610, is reversible error. We also conclude that, in any event, the State failed to prove by clear and convincing evidence that respondent was subject to involuntary admission. Accordingly, we reverse both the July 28, 1995, and the August 25, 1995, orders. In light of these conclusions, we need not address respondent's other contentions.

## I

Respondent's first contention is that the State's failure to comply with section 3—610 of the Code by providing him with a psychiatric examination within 24 hours of his admission to St. Joseph's and filing a second certificate executed by a psychiatrist constitutes reversible error. The State concedes that no second certificate was ever executed, but maintains that a reasonable reading of Dr. Gavinon's testimony indicates she examined respondent within 24 hours of his admission. Thus, the State argues, its violation of section 3—610 was a mere technical deficiency and does not require reversal. Alternatively, the State asserts that respondent may not raise the absence of a second certificate on appeal because, immediately prior to the start of the hearing on the petition, respondent's counsel stated that there was no issue as to the "certificates." Thus, according to the State, respondent has waived any objection to the absence of a second certificate.

■ Involuntary admission procedures represent the legislature's attempt to balance the individual's interest in liberty against society's dual interests in protecting itself from dangerous mentally ill persons and caring for those who are unable to care for themselves. *In re James*, 191 Ill. App. 3d 352, 356 (1989). The Code's procedural safeguards are not mere technicalities. *In re Luttrell*, 261 Ill. App. 3d 221, 230 (1994). Rather, they are essential tools to safeguard the liberty interests of respondents in mental health cases. *Luttrell*, 261 Ill.

App. 3d at 230. Because involuntary admission proceedings pose a grave threat to an individual's liberty interests, the Code's procedural safeguards should be strictly construed in favor of the respondent. *In re La Touche*, 247 Ill. App. 3d 615, 618 (1993).

With the above principles in mind, we now turn to respondent's contention that the State's failure to provide him with a psychiatric examination within 24 hours of his hospitalization or to file a second certificate constitutes reversible error. First, the record is ambiguous as to whether Dr. Gavinon examined respondent within 24 hours of his admission. While Dr. Gavinon testified that she had a conversation with respondent on July 19, 1995, the day of his admission, the State failed to elicit testimony as to whether this conversation was part of a psychiatric examination. The State similarly neglected to elicit testimony as to precisely when this conversation occurred. Acknowledging the ambiguity in the record, the State asks us to assume that the psychiatric examination occurred within 24 hours of respondent's admission.

■ We decline to make this assumption. As one panel of the appellate court has recently noted, courts should not engage in speculation in order to reach the assumption that proper procedures were followed in involuntary admission cases. *Luttrell*, 261 Ill. App. 3d at 229. As *Luttrell* further noted, the deadlines set forth in the Code are bright line rules created by the legislature to avoid deciding cases such as this on an *ad hoc* basis. 261 Ill. App. 3d at 229. "That the statutory procedures *may* have been followed offers little certainty that respondent's liberty interests have, *in fact*, been safeguarded." (Emphasis in original.) *Luttrell*, 261 Ill. App. 3d at 229. We conclude, based on the record before us, that the State has not shown that respondent was examined by a psychiatrist within 24 hours of his admission.

Given that the State has failed to demonstrate respondent was examined by a psychiatrist within 24 hours of his admission, we must reverse the order of involuntary admission. A virtually identical situation arose in *People v. Valentine*, 201 Ill. App. 3d 10 (1990). There, the State failed to have the patient examined by a psychiatrist within 24 hours of her admission to the hospital, but argued that section 3—610 was "a technical requirement that does not affect basic rights." See *Valentine*, 201 Ill. App. 3d at 12. The appellate court rejected this argument and held that the failure to comply with section 3—610 was reversible error. See *Valentine*, 201 Ill. App. 3d at 13-14. The appellate court concluded:

> "The legislature has created a bright line. The State has 24 hours. No doubt, the bright line was created as a prophylactic

against deciding these kinds of cases on an *ad hoc* basis. When we recall that other governments have used involuntary commitment to a mental hospital as a ruse, as a device to silence critics, we feel that this bright line is but one brick in a wall against the evils of tyranny that we, in this country, have erected." *Valentine*, 201 Ill. App. 3d at 13.

See also *In re C.E.*, 161 Ill. 2d 200, 215 (1994) (citing *Valentine* with approval); *La Touche*, 247 Ill. App. 3d at 620 (same); *In re Houlihan*, 231 Ill. App. 3d 677, 681 (1992) (same).

Moreover, as the State concedes, regardless of whether Dr. Gavinon examined respondent in a timely fashion, she failed to execute a certificate as required by section 3—610. Consequently, no second certificate was ever filed. Section 3—610 is, on its face, a mandatory provision. It provides that, if its requirements are not satisfied, the respondent "shall be released forthwith." See 405 ILCS 5/3—610 (West 1994). Thus, in light of the fact that no second certificate was ever executed or filed, respondent should have been released "forthwith." The State's failure to comply with the requirements of section 3—610 is inexcusable and is grounds for reversal. See *Valentine*, 201 Ill. App. 3d at 12-14.

■ Additionally, we reject the State's argument that respondent has waived this error by failing to raise an objection in the trial court. Admittedly, respondent's counsel failed to bring the State's noncompliance with section 3—610 to the trial court's attention. However, a long line of involuntary admission cases has held that "[e]rrors demonstrating noncompliance with the statutory provisions that appear on the face of the record may render a judgment erroneous even if not raised at trial; furthermore, such errors may be considered on appeal under a doctrine analogous to plain error." See *In re Martens*, 269 Ill. App. 3d 324, 327 (1995); see also *In re Watts*, 250 Ill. App. 3d 723, 727-28 (1993); *La Touche*, 247 Ill. App. 3d at 618; *In re Stone*, 178 Ill. App. 3d 1084, 1087 (1989); *In re Whittenberg*, 143 Ill. App. 3d 836, 837-38 (1986). Thus, because the State's failure to comply with section 3—610 appears on the face of the record, and respondent clearly suffered prejudice as a result, we decline to apply waiver in this case.

## II

Although we have concluded above that the State's failure to comply with section 3—610 of the Code is reversible error, there is another independent basis which supports reversal of the order of involuntary admission. The testimony adduced in the trial court was insufficient to prove, by clear and convincing evidence, that respondent was subject to involuntary admission.

As noted above, involuntary admission procedures implicate substantial liberty interests which must be balanced against the State's dual interests in protecting society from dangerous mentally ill persons and protecting those who are unable to care for themselves. *James*, 191 Ill. App. 3d at 356. However, a mentally ill person may not be confined against his will merely because of a mental illness if he can live safely in freedom. *In re Tuman*, 268 Ill. App. 3d 106, 110 (1994); see also *O'Connor v. Donaldson*, 422 U.S. 563, 575, 45 L. Ed. 2d 396, 407, 95 S. Ct. 2486, 2493 (1975) ("the mere presence of mental illness does not disqualify a person from preferring his home to the comforts of an institution"). In keeping with these principles, section 1—119(2) of the Code provides that a person may not be involuntarily admitted unless he is "[a] person with mental illness and who because of his or her illness is unable to provide for his basic physical needs so as to guard himself or herself from serious harm." See 405 ILCS 5/1—119(2) (West 1994). Additionally, under section 3—808 of the Code, "[n]o respondent may be found subject to involuntary admission unless that finding has been established by clear and convincing evidence." 405 ILCS 5/3—808 (West 1994).

■ Thus, where the State seeks involuntary admission under section 1—119(2), it has the burden to prove, by clear and convincing evidence, both that a respondent is mentally ill and that as a result of this illness he is unable to care for his basic physical needs so as to guard himself from serious harm. See *In re Schumaker*, 260 Ill. App. 3d 723, 727 (1994); *In re Winters*, 255 Ill. App. 3d 605, 608-09 (1994). A reviewing court will not disturb the trial court's decision regarding involuntary admission unless it is against the manifest weight of the evidence. *Schumaker*, 260 Ill. App. 3d at 727.

■ Applying the above standards to the present case, we conclude that the trial court's determination that respondent is mentally ill is supported by clear and convincing evidence. Dr. Gavinon testified that she performed a psychiatric examination on respondent which included reviewing his medical records and speaking with him and members of his family. As a result of the examination, she concluded that he suffered from schizophrenic disorder, undifferentiated type, which is considered a mental illness. She also explained that respondent possessed many classic symptoms of this illness, including hallucinations, delusions, inability to talk in a codirective manner, and a blunted or inappropriate affect. Respondent presented no evidence to contradict Dr. Gavinon's diagnosis. Thus, we conclude that her testimony establishes by clear and convincing evidence that respondent was mentally ill.

■ However, merely demonstrating that a respondent is mentally

ill does not allow the State to confine him against his wishes. See *Winters*, 255 Ill. App. 3d at 609. A person may not be involuntarily admitted if he is " 'dangerous to no one and can live safely in freedom.' " *Winters*, 255 Ill. App. 3d at 609, quoting *O'Connor*, 422 U.S. at 575, 45 L. Ed. 2d at 407, 95 S. Ct. at 2493. Thus, in addition to proving that respondent was mentally ill, section 1—119(2) requires the State to prove by clear and convincing evidence that respondent is unable to provide for his basic physical needs so as to guard himself against serious harm. See 405 ILCS 5/1—119(2) (West 1994). Our review of the evidence presented at the July 28, 1995, hearing indicates the State did not meet this burden.

The State presented virtually no evidence indicating that respondent is unable to provide for his basic physical needs. To determine whether a person can provide for his basic physical needs, we consider the following factors: whether he can obtain his own food, shelter, and medical care; whether he has a place to live or a family to assist him; whether he can function in society; and whether he has an understanding of money and a concern for it as a means of sustenance. See *Winters*, 255 Ill. App. 3d at 609; *In re Long*, 237 Ill. App. 3d 105, 110 (1992). Although the evidence produced at the hearing indicated that respondent was indeed mentally ill, it did not demonstrate that he was unable to care for himself.

The testimony of Stanley, Sr., was, at best, vague and inconclusive. According to Stanley, Sr., respondent had lived with him all of his life but had begun to act abnormally in mid-July 1995. However, the only instances of abnormal behavior described by Stanley, Sr., were respondent's statement that he did not need anyone; his statement that voices told him to go to the mall and play the banjo; and his use of mineral oil to "mark" areas of the house for protection. Undoubtedly, this behavior is odd and suggests that respondent was mentally ill; it does not, however, suggest that he is "unable to provide for his basic physical needs so as to guard himself *** from serious harm." See 405 ILCS 5/1—119(2) (West 1994). Thus, Stanley, Sr.'s testimony is more significant for its omissions than for its content.

Moreover, the omissions are significant in light of prior case law. For example, the State failed to elicit testimony from Stanley, Sr., that respondent was unable to care for himself, obtain food, get sufficient rest, understand the importance of money, or function in society. See *Long*, 237 Ill. App. 3d at 110. Additionally, while the fact that Stanley, Sr., filed the petition for involuntary admission indicates he believed respondent needed hospitalization, he did not testify that he was unable to cope with respondent or that he no lon-

ger wished respondent to live with him. The burden is on the State to show that respondent is subject to involuntary admission. See *Winters*, 255 Ill. App. 3d at 608-09. Stanley, Sr.'s vague testimony is plainly insufficient to meet this burden.

Nor did Dr. Gavinon's testimony demonstrate that respondent was unable to provide for his basic physical needs so as to guard himself from serious harm. She testified extensively and convincingly that respondent showed symptoms of mental illness. However, her testimony regarding his ability to take care of himself is as vague and conclusory as that of Stanley, Sr. For example, Dr. Gavinon testified regarding respondent's reluctance to talk to her and attributed his suspicious nature to mental illness. However, she failed to note that he was under no obligation to talk to her or any other doctor. In fact, the petition for involuntary admission contains a section entitled "Rights of Admittee," which states that "[w]hen you are first examined by a physician, clinical psychologist, qualified examiner, or psychiatrist, you do not have to talk to the examiner. Anything you say may be related by the examiner in court on the issue of whether you are subject to involuntary or judicial admission." In light of this written admonishment, respondent's reluctance to speak to Dr. Gavinon and his expressed desire to avoid "incriminat[ing]" himself hardly seems a product of irrational delusions.

Additionally, Dr. Gavinon's testimony about respondent's poor personal hygiene while hospitalized tells us little about his ability to care for himself. First, a person's poor hygiene is, in itself, not a sufficient basis to conclude that he is unable to care for himself in order to prevent serious harm. See *Tuman*, 268 Ill. App. 3d at 112-13 (poor grooming habits insufficient to establish that respondent is subject to involuntary admission). Second, the State presented no evidence regarding respondent's hygiene prior to his hospitalization. Thus, the evidence that respondent failed to bathe or change his clothes for several days while at St. Joseph's does not show that, while living with Stanley, Sr., he was unable to care for himself so as to guard himself from serious harm.

Finally, Dr. Gavinon's statements regarding respondent's ability to obtain employment, food, and shelter are unhelpful. She opined that respondent could not obtain employment because he had "distorted beliefs about different things." She did not, however, explain what "things" he held distorted beliefs about or how his distorted beliefs would affect his employability. Further, her opinion about respondent's employability was unsupported by any specific facts and is, therefore, of limited evidentiary value. See *Luttrell*, 261 Ill. App. 3d at 227 (expert opinion unsupported by evidence given

minimal consideration); *Winters*, 255 Ill. App. 3d at 609 ("an expert's opinion is only as valid as the reasons for it").

We note that respondent testified that the voices he heard told him to run around naked, to stop eating and sleeping, and to commit suicide. This testimony, however, could not have been a basis for the trial court's July 28, 1995, order, which had him admitted involuntarily to St. Joseph's, since the testimony was given on August 18, 1995, at the hearing on the State's petition to transfer respondent to EMHC. Nor do we believe that this testimony supports the trial court's August 25, 1995, order, which extended respondent's hospitalization for an additional 30 days, since there is no evidence that respondent actually engaged or attempted to engage in these activities. We conclude, therefore, that the trial court's determination that respondent was subject to involuntary admission is against the manifest weight of the evidence.

A review of the relevant case law provides support for our conclusion. In *In re Tuman*, 268 Ill. App. 3d 106 (1994), we reversed the trial court's finding that the respondent was subject to involuntary admission. There, the evidence showed that the respondent had been hospitalized for mental health reasons 76 previous times, she was irritable, could not carry on a conversation, suffered from impaired judgment, and did not groom herself properly. *Tuman*, 268 Ill. App. 3d at 112. There was no evidence, however, to show that the respondent could not obtain her own food, shelter, or medical care. *Tuman*, 268 Ill. App. 3d at 113. We concluded that although the respondent had difficulty functioning in society, there was insufficient evidence that she could not guard herself from serious harm. *Tuman*, 268 Ill. App. 3d at 113.

Similarly, in *In re Winters*, 255 Ill. App. 3d 605 (1994), the evidence established that the respondent was confused, delusional, and occasionally hostile. She had attempted to strike a nurse at the hospital in which she was confined, refused to take medication, made bizarre statements about "Hail Mary" being with her, and had delusions of pregnancy. *Winters*, 255 Ill. App. 3d at 606-08. We reversed the trial court's order involuntarily admitting the respondent, noting that it is improper to assume that a person who suffers from schizophrenia will fail to provide for basic physical needs such as food and sleep. *Winters*, 255 Ill. App. 3d at 609. The *Winters* court further noted that the respondent's refusal to take medication was not a valid basis for involuntary admission because the right to refuse psychotropic medication is statutorily guaranteed. 255 Ill. App. 3d at 609-10, citing 405 ILCS 5/2—107 (West 1992).

In contrast, the behavior of the respondents in cases where the

appellate court has affirmed orders of involuntary admission was significantly more extreme than that of the respondents in *Tuman*, *Winters*, or the present case. See, *e.g.*, *In re Slaughter*, 253 Ill. App. 3d 718 (1993) (respondent had extensive history of suicidal behavior); *In re Friberg*, 249 Ill. App. 3d 86 (1993) (respondent demonstrated aggressive, delusional behavior, threatened doctors, believed he was God); *In re Barnard*, 247 Ill. App. 3d 234 (1993) (respondent had history of pedophilia including a criminal conviction, had written letters to then-President Bush stating that God had informed him about future events); *In re Tally*, 215 Ill. App. 3d 385 (1991) (respondent lived in a bug-infested apartment filled with rotten food, had caused a fire by leaving his stove unattended, attempted to hail a bus by standing in front of it, believed he was Ronald McDonald, and believed he owned all McDonald's restaurants); *In re Manis*, 213 Ill. App. 3d 1075 (1991) (respondent was a delusional schizophrenic, stayed in bed all day, never held a job, had no income, had to be reminded to perform bodily functions, and ate tobacco); *In re James*, 199 Ill. App. 3d 316 (1990) (respondent was an extremely violent paranoid schizophrenic); *In re Ingersoll*, 188 Ill. App. 3d 364 (1989) (respondent was homeless and insolvent, agitated, confused, delusional, and suffered from numerous physical ailments and wild hallucinations).

A comparison of the cases where the appellate court has affirmed section 1—119 involuntary admissions with cases where it has reversed such admissions demonstrates the continuing viability of the rule that the State may not confine a nondangerous mentally ill person who is capable of surviving safely in freedom. See *O'Connor*, 422 U.S. at 576, 45 L. Ed. 2d at 407, 95 S. Ct. at 2494; *Winters*, 255 Ill. App. 3d at 609. The record in the present case reveals a disturbing paucity of evidence indicating that respondent is unable to live safely in freedom. Accordingly, based on our review of the evidence presented at the July 28, 1995, and August 25, 1995, hearings and our reading of prior cases, we conclude that the State failed to prove by clear and convincing evidence that respondent was unable to provide for his basic physical needs so as to guard himself from serious harm.

For the reasons stated above, we reverse the circuit court of Kane County's July 28, 1995, order involuntarily admitting respondent and its August 25, 1995, order extending respondent's involuntary admission.

Reversed.

INGLIS and THOMAS, JJ., concur.