NOS. 4-06-0046, 4-06-0133 cons.    Filed 6/5/07

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

In re LISA G.C., a Person Found Subject    )    Appeal from
to Involuntary Admission,                  )    Circuit Court of
THE PEOPLE OF THE STATE OF ILLINOIS,       )    Sangamon County
        Petitioner-Appellee,          )    No. 05MH655
        v.                            )
LISA G.C.,                                 )    Honorable
        Respondent-Appellant.         )    Leslie J. Graves,
                                      )    George H. Ray,
                                      )    Judges Presiding.
_____

JUSTICE COOK delivered the opinion of the court:

On December 8, 2005, a petition for the involuntary admission of respondent, Lisa G.C., was filed pursuant to section 3-600 of the Mental Health and Developmental Disabilities Code (Code) (405 ILCS 5/3-600 (West 2004)).  After a December 30, 2005, hearing, the trial court ordered respondent hospitalized in a Department of Mental Health and Developmental Disabilities facility for 90 days.  On January 4, 2006, respondent appealed, No. 4-06-0046.

On January 25, 2006, pending her appeal, respondent filed a petition for discharge.  The trial court appointed counsel to represent respondent.  The court held a hearing on January 27, 2006, at which time the petition was denied.  On February 1, 2006, respondent appealed, No. 4-06-0133.  We have consolidated the two appeals.

In No. 4-06-0046, respondent appeals her initial

hospitalization, contending (1) her procedural due-process rights were violated and (2) the State failed to prove by clear and convincing evidence her involuntary admission was warranted. In No. 4-06-0133, respondent appeals the denial of her petition for discharge, contending the State failed to prove by clear and convincing evidence that she remained subject to involuntary admission. We affirm.

## I. BACKGROUND

On December 8, 2005, Brian Boston, of Carlinville Area Hospital, signed a petition for emergency involuntary admission asserting respondent was mentally ill, was reasonably expected to inflict serious physical harm upon herself or another in the near future due to her mental illness, and was in need of immediate hospitalization for the prevention of such harm. The petition was accompanied by a medical certificate by Dr. W.J. Townsend stating respondent was subject to involuntary admission and in need of immediate hospitalization. That same date the trial court set a hearing date for December 9, 2005. At that time, respondent was being treated at Memorial Medical Center (Memorial).

On December 9, 2005, Dr. Shyam Bhat's medical certificate, reaching the same conclusion as Dr. Townsend, was filed and the State requested a continuance. The trial court granted a continuance until December 16, 2005.

- 2 -

On December 16, 2005, the trial court entered an order on a preprinted form, which stated that on the State's motion, by agreement of the parties and pursuant to section 3-908 of the Code (405 ILCS 5/3-908 (West 2004)), respondent was transferred to McFarland Mental Health Center (McFarland). On December 16, 2005, the hearing was continued to December 23, 2005, by agreement of the parties.

On December 19, 2005, a notice of change in status dated December 16 was filed, indicating respondent had been transferred to McFarland on December 16, 2005. Also on December 19, 2005, Dr. Gregory Gergay filed a medical certificate. On December 20, 2005, Dr. G. Midathala filed a medical certificate. On December 23, 2005, on the State's motion, the trial court continued respondent's hearing to December 30, 2005. On December 29, 2005, Dr. James Myers filed a medical certificate supporting respondent's involuntary commitment.

At the December 30, 2005, hearing, Dr. Myers, a clinical psychologist, testified he was currently treating respondent. Respondent demonstrated paranoid delusions. Dr. Myers noted respondent indicated (1) she had information about the World-Trade-Center-bombing terrorist attack, the Pentagon terrorist attack, and the Oklahoma City bombing and "spoke in a very descriptive manner about people involved in various nefarious attacks"; (2) she knew George Bush and Senator Durbin were

- 3 -

involved in the Twin Towers terrorist attack; (3) she had a granddaughter who was decapitated in a police car and she saw another family member walking away from the police car, but she could not say how she knew this information; (4) three of her five children had been murdered; and (5) people were threatening her.

Respondent also paced back and forth during much of her interview with Dr. Myers and carried a packet of information, including a telephone book, which she also carried in court. Besides evaluating respondent, Dr. Myers reviewed two prior State hospitalizations in order to make a diagnosis of schizo-affective disorder. Dr. Myers believed respondent could reasonably be expected to inflict serious physical harm on herself or others as a result of her mental illness. He suggested her paranoid delusions would make it likely she would be aggressive and violent if she believed someone with whom she identifies is threatened. She might act aggressively and violently to protect them.

Dr. Myers further stated since respondent had been at McFarland, she had not taken any medication or participated in treatment as she did not believe she was mentally ill. Dr. Myers found respondent to be in need of treatment, opined that McFarland was the least-restrictive alternative for treatment, and recommended a commitment period of 90 days.

- 4 -

Respondent testified that between 13 and 14 members of her family had been murdered over the past 38 years by her mother and her brother-in-law. They bought Tylenol, which the murder victims took, and it killed them. She knew the government was involved, although her brother-in-law told her the Pentagon did not deal with that. Respondent stated she wanted the people who murdered her family to stand trial "very publicly." She stated she did not want to physically harm the murderers, she just wanted to press charges. Respondent further stated she had no desire to hurt herself and called the police when her sister attacked her.

After hearing the evidence, the trial court found respondent suffered from a mental illness, was at risk of harming herself or another, and needed treatment. The court committed respondent for 90 days. Respondent appealed.

Pending her appeal, on January 25, 2006, respondent filed a petition for discharge that is the subject of appeal in No. 4-06-0133. On January 27, 2006, the trial court held a hearing. At the hearing, respondent testified that she had an address in one city and owned a trailer in another city. Respondent also stated she was an inactive licensed practical nurse (LPN) and had two living children. Three of her children had died. If she could get a vehicle, respondent claimed she could work as a waitress or use her inactive nurse's license. With her

income and the occasional use of public aid, respondent stated that in the past she had supported herself and her children. Respondent claimed she was not suicidal and only had high blood pressure "after they put illicit drugs in my drink and broke into my trailer *** smearing blood on me." Respondent stated she treats her aches in pains with "jalapenos, spicy food, and Tylenol." Respondent believed she could care for herself and would not physically harm herself or another.

On cross-examination, respondent explained that on December 8, 2005, she called "9-1-1" because her nephew insulted her and he would not leave, then her daughter struck her. When she went with the police officer to fill out reports, he took her to Carlinville Hospital and contacted Brian from Macoupin County Mental Health. Respondent informed Brian that she knew the name of the girl that they decapitated and that she had a picture of her. She added that the girl's name was Carrie and that Carrie's husband, Tom, served in the Navy. Respondent continued to talk about illicit drugs being put into her drinks and blood being smeared on her. She also maintained that three of her children had been murdered, one at a dentist's office. Respondent referred to Enron, George Ryan, rape, and murder during the cross-examination.

The trial court denied the petition. The court noted that respondent had not testified clearly, had not explained

whether she had a place to live, and was clearly in need of further treatment.  Respondent appeals this ruling as well.

## II. ANALYSIS

### A. Procedural Due Process

In No. 4-06-0046, respondent asserts her right to due process was violated when she was initially committed because (1) she was improperly transferred to McFarland and (2) her commitment hearing was not timely held.

In involuntary-commitment proceedings, strict compliance with statutory procedures is required since such proceedings affect important liberty interests.  In re Rovelstad, 281 Ill. App. 3d 956, 964-65, 667 N.E.2d 720, 725 (1996).  Whether the State strictly complied with the procedural requirements of the Code is a question of law to be reviewed de novo.  In re George O., 314 Ill. App. 3d 1044, 1046, 734 N.E.2d 13, 15-16 (2000). Reversal is required for failure to comply with the requirements of the Code where respondent is prejudiced by such failure.  In re Louis S., 361 Ill. App. 3d 763, 768, 838 N.E.2d 218, 222 (2005).  Because respondent is unable to demonstrate how she was prejudiced by any alleged failure to comply with procedural requirements, we find her right to due process was not violated.

### 1. Transfer to McFarland

Respondent argues that she was improperly transferred to McFarland.  On December 19, 2005, a notice of change in status

dated December 16 was filed, indicating respondent had been transferred to McFarland from Memorial on December 16, 2005. Further, on December 16, 2005, the trial court entered an order stating that, on the State's motion, by agreement of the parties, and pursuant to section 3-908 of the Code (405 ILCS 5/3-908 (West 2004)), respondent was transferred to McFarland.

Sections 3-908 through 3-910 of the Code (405 ILCS 5/3-908 through 3-910 (West 2004)) address transfer between Department facilities of a person receiving treatment. Specifically, section 3-908 addresses the procedure for transferring patients between state facilities. 405 ILCS 5/3-908 (West 2004). Section 3-908 does not address transfers such as this one in which a patient is transferred from a private facility to a state facility. In In re Hays, 102 Ill. 2d 314, 320, 465 N.E.2d 98, 101 (1984), the Supreme Court of Illinois, when addressing the issue of whether a petition for involuntary commitment of a voluntarily admitted patient may properly be brought when the patient has not made a request to be discharged, noted that "[w]hile a State facility may transfer a patient to another State facility when it is deemed 'clinically advisable,' a private institution may not invoke these provisions of the Code." Further, in Louis S., this court found the only means by which a respondent could be transferred from Memorial, a private institution, to McFarland, a state institution, was (1) in a dispositional order after he was

- 8 -

found to be a person subject to involuntary commitment or (2) by a discharge from Memorial and the initiation of emergency involuntary commitment proceedings under the Code, and since the respondent's transfer was not by either of those means, his transfer to McFarland was improper.  Louis S., 361 Ill. App. 3d at 770, 838 N.E.2d at 223.

In this case, respondent's transfer to McFarland was not accomplished by either of the means discussed in Louis S. While the transfer may have been improper, the State argues respondent did not suffer any prejudice because she agreed to the transfer to McFarland.  Respondent argues her transfer was presumptively prejudicial because it was a transfer to a more restrictive state facility and occurred prior to her hearing on the petition for involuntary commitment.  We agree with the State.

Respondent has not demonstrated how she suffered any prejudice by a transfer with which she originally agreed.  Upon respondent's initial admission, the State complied with the Code's requirements for involuntary admission as two certificates from a physician and psychiatrist who had examined respondent were timely filed.  See 405 ILCS 5/3-601, 3-602 (West 2004). Once admitted to McFarland, respondent was examined by a physician within 24 hours who found her to be subject to involuntary admission.  Another psychiatrist examined her the next day and

- 9 -

concluded the same. Both doctors informed respondent of her rights before the examinations. The State treated respondent's admission to McFarland as an initial involuntary admission, and all procedural safeguards were followed.

Most significant is respondent's agreement to the transfer. Respondent could have objected to the transfer and required the State to discharge her from Memorial, and then re-institute an emergency involuntary-commitment proceeding to have her placed in McFarland. Instead of going through the whole process of reinstituting proceedings with the almost certain outcome of her placement in McFarland, respondent agreed to forego repeating the process and get to the involuntary-commitment hearing more quickly. Respondent cannot now claim on appeal she was prejudiced by her agreement.

We find it unremarkable that the record is devoid of how respondent came to "agree" to the transfer as the trial court is not required to set forth the bases or reasons for its rulings. People ex rel. Madigan v. Petco Petroleum Corp., 363 Ill. App. 3d 613, 636, 841 N.E.2d 1065, 1083 (2006). The trial court need not always make a record, as in many cases there may be no dispute when a ruling is made and no need to go into detail to explain it. A litigant should not be allowed to stand by while a ruling is made and then object for the first time in the appellate court. In the present case, if there was a misstatement in

- 10 -

the trial court's ruling, respondent's attorney should have so advised the court. A record would then have been made. We should resolve any doubts due to the incompleteness of the record against the respondent, the appellant. <u>Foutch v. O'Bryant</u>, 99 Ill. 2d 389, 392, 459 N.E.2d 958, 959 (1984).

2. <u>Timeliness of the Hearing</u>

Respondent next argues her hearing was untimely and unduly delayed. Section 3-611 of the Code requires that "the court shall set a hearing" regarding the petition for involuntary commitment "to be held within [five] days, excluding Saturdays, Sundays[,] and holidays, after receipt of the petition." 405 ILCS 5/3-611 (West 2004). Respondent was admitted on December 8, 2005, and though her hearing was originally set for December 9, 2005, her hearing was not held until December 30, 2005.

To comply with section 3-611, respondent's hearing should have been held on or before December 15. The hearing was not held until December 30, 2005, due to three continuances. Section 3-800(b) sets forth a procedure in which trial courts may grant continuances in mental-health cases. 405 ILCS 5/3-800(b) (West 2004). Section 3-800(b) states the following:

"If the court grants a continuance on its own motion or upon the motion of one of the parties, the respondent may continue to be detained pending further order of the

- 11 -

court.  Such continuance shall not extend
beyond 15 days except to the extent that
continuances are requested by the respondent."
405 ILCS 5/3-800(b) (West 2004).

In this case, respondent was detained for 22 days, including weekends and holidays, before her hearing.  Three continuances were granted.  Respondent was admitted December 8 with the hearing set for December 9.  On December 9 on the State's motion, the hearing was continued to December 16.  On December 16, by agreement of the parties, the hearing was continued to December 23.  On December 23, on the State's motion, the hearing was continued to December 30.  The State argues that none of the continuances, including the last continuance that pushed the detention beyond 15 days, were for a period of greater than 15 days, so the plain language of section 3-800(b) was not violated.  Respondent argues her hearing had to be held on or before December 15 according to section 3-611 and section 3-800(b) should not apply.

We find that section 3-800(b) plainly allows the trial court to grant continuances beyond the deadline imposed by section 3-611.  While the parties disagree as to the length of delay allowed by section 3-800(b), we need not determine the precise allowable length of delay because respondent has not established prejudice.  According to section 3-611, respondent's

- 12 -

hearing should have been held before December 15.  Section 3-800(b), though, allows for continuances.  After the first 7-day continuance, respondent agreed to the second 7-day continuance requested on December 16 to December 23, bringing respondent's detention to 15 days total, including weekends.  The continuance requested on December 23 was for seven more days.  The hearing held on December 30 was only 15 days after the deadline established under section 3-611.  Respondent has not established how the three seven-day continuances prejudiced her in light of her agreement to the second seven-day continuance.

In support of her position, respondent cites generally In re Williams, 140 Ill. App. 3d 708, 489 N.E.2d 347 (1986).  In that case, the court determined that the Code mandated that the hearing be held within 20 days and the 5 1/2 months of detention between the respondent's initial detention and hearing was clearly a serious abuse of that respondent's rights.  Williams, 140 Ill. App. 3d at 712, 489 N.E.2d at 351.  While prejudice is clear from a 5 1/2-month delay, such prejudice cannot be presumed from a delay of 22 days when the respondent agreed to a 7-day continuance.

B. Clear and Convincing Evidence for Involuntary Admission

Respondent next argues that the State failed to prove she was reasonably expected to seriously harm herself or another in the near future.  A person may be involuntarily admitted if it

- 13 -

is established by clear and convincing evidence (405 ILCS 5/3-808 (West 2004)) that the person has a mental illness and "because of his or her illness is reasonably expected to inflict serious physical harm upon himself or herself or another in the near future." 405 ILCS 5/1-119(1) (West 2004). The standard of review for an involuntary-commitment proceeding is whether the judgment is against the manifest weight of the evidence. In re Knapp, 231 Ill. App. 3d 917, 919, 596 N.E.2d 1171, 1172 (1992). The trial court's decision is given great deference and, absent a showing that it is against the manifest weight of the evidence, it "'will not be set aside at the appellate level, even if the reviewing court, after applying the clear and convincing standard, would have ruled differently.'" In re Bennett, 251 Ill. App. 3d 887, 888, 623 N.E.2d 942, 944 (1993), quoting In re Orr, 176 Ill. App. 3d 498, 505, 531 N.E.2d 64, 69 (1988).

The trial court's finding that respondent was mentally ill is not in dispute. Dr. Myers diagnosed respondent as having schizo-affective disorder. While respondent does not dispute that she has a mental illness, she claims Dr. Myers' testimony never clearly and convincingly proved that, due to her mental illness, she was reasonably expected to threaten or imminently harm herself or another. Respondent points to Dr. Myers' testimony that established that she had never been committed, had never been physically aggressive, and had never expressed to him

- 14 -

an intent to harm herself or anyone else.

We note first that a treating psychiatrist's opinion of potential dangerousness need not be derived from firsthand observations of violence and may be based on knowledge of incidents derived from medical history records. In re Houlihan, 231 Ill. App. 3d 677, 683, 596 N.E.2d 189, 194 (1992). An examining physician may properly consider a respondent's complete medical history in forming her opinion concerning that respondent's current and future dangerousness. In re Robert H., 302 Ill. App. 3d 980, 986, 707 N.E.2d 264, 269 (1999). Further, the court does not have to wait until respondent hurts himself or someone else before involuntarily committing him. In re Manis, 213 Ill. App. 3d 1075, 1077, 572 N.E.2d 1213, 1214 (1991). Because the court is in a superior position to determine witness credibility and to weigh evidence, we give great deference to the court's findings. Knapp, 231 Ill. App. 3d at 919, 596 N.E.2d at 1172.

Dr. Myers testified that he personally met with and examined respondent. Upon examining respondent, Dr. Myers noted that she spoke "in a very descriptive manner" about people involved in "nefarious activities" such as the World Trade Center bombing, the attack on the Pentagon, and Oklahoma City. During the interview, respondent paced back and forth and carried a packet of information that she also carried to court. Respondent had been hospitalized, possibly on a voluntary basis, on two

prior occasions. Respondent suffered from paranoid delusions, and "given the severity of her delusions," Dr. Myers opined that she was likely to act aggressively. While Dr. Myers acknowledged that respondent had not been aggressive while at McFarland, he noted that she was reported to have become "increasingly aggressive towards her family" when in the community and had refused treatment at McFarland.

In the emergency petition, the officer who dealt with respondent wrote that respondent believed several people, including local politicians and authorities, were "out to get her" and her father had stated that respondent had begun to say that these people should die and talked of getting weapons. Dr. Townsend wrote in his certificate that respondent "had made threatening comments/gestures toward local government officials and ha[d] started to talk of acquiring weapons to use on these officials." Further, Dr. Townsend noted respondent was getting aggressive with her daughter. In Dr. Bhat's certificate, he wrote that respondent talked about getting weapons and believed the State's Attorney was out to get her. Dr. Gregory found respondent showed "increasingly delusional and threatening behavior." Dr. Midathala reported in his certificate that respondent believed local government officials were out to get her, particularly the State's Attorney, and believed that those people should die.

In respondent's comprehensive physical, psychiatric,

and social investigation, Dr. Midathala reported that respondent was "suspicious" and "slightly hostile." He described her affect as "angry, irritable, increased intensity, and decreased range." Respondent's speech was described as "increased rate and volume, pressure of speech present" and delusions were "probably persecution, grandiose." Dr. Midathala described respondent's judgment and insight as poor, particularly because she does not believe she has a mental illness and does not want to take medication.

Finally, respondent's testimony showed that she believed that more than 10 of her family members were murdered and the government was involved. She stated she did not want to hurt herself but her sister had attacked her and she was "not going to be their punching bag anymore."

Based on respondent's medical records, Dr. Myers' testimony, and respondent's testimony, the trial court's finding that respondent was subject to involuntary admission was not against the manifest weight of the evidence.

Respondent also argues that the State failed to show that hospitalization was the least-restrictive form of treatment available. Section 3-810 of the Code requires that the trial court instruct that a report be prepared as to appropriateness and availability of alternative treatment settings. 405 ILCS 5/3-810 (West 2004). Section 3-811 of the Code requires that the court order the least-restrictive treatment alternative. 405

ILCS 5/3-811 (West 2004). While the trial court did not explic-itly discuss the various treatment alternatives in this case, section 3-810 does not require a detailed report on treatment alternatives. Louis S., 361 Ill. App. 3d at 771, 838 N.E.2d at 224. The court may order commitment if the report in its en-tirety, coupled with the evidence at the hearing, shows hospital-ization is the least-restrictive alternative. Louis S., 361 Ill. App. 3d at 771, 838 N.E.2d at 224.

In this case, Dr. Myers testified that hospitalization was the least-restrictive treatment option available. The comprehensive psychiatric evaluation showed respondent made "numerous delusional statements" that were described as violent, involving bombings, decapitation, and murder. Dr. Myers opined that it was "very likely that in order to protect someone who[m] she feels[,] similar to herself, when she feels that person or herself is threatened, given the severity of the crimes in her delusions, *** that she might very well act aggressively and violently to protect." The report and evidence at trial support the court's finding that commitment was the least-restrictive alternative.

C. Denial of Petition for Discharge

In No. 4-06-0133, respondent argues that the trial court erred in denying her petition for discharge because the State failed to present clear and convincing evidence that she

- 18 -

was in need of continued involuntary admission.  Section 3-900 of the Code allows for a committed person to file a petition for discharge at any time (405 ILCS 5/3-900 (West 2004)).  The respondent has the obligation of presenting a <u>prima</u> <u>facie</u> case that he should be discharged.  <u>In re Smoots</u>, 189 Ill. App. 3d 289, 291, 544 N.E.2d 1235, 1237 (1989).  The respondent's own sworn statements may be treated as a <u>prima</u> <u>facie</u> case for dis-charge.  <u>Smoots</u>, 189 Ill. App. 3d at 291, 544 N.E.2d at 1237.  If the respondent is able to present a <u>prima</u> <u>facie</u> case, the State must prove by clear and convincing evidence that the respondent's petition should be denied.  <u>Smoots</u>, 189 Ill. App. 3d at 291, 544 N.E.2d at 1237.

In this case, respondent failed to present a <u>prima</u> <u>facie</u> case.  Respondent's petition for discharge did not state the reasons she was requesting the discharge.  Respondent instead described talking with police officers about "police brutality," her transfer to McFarland, forced medication, and a denial of attorney-client privilege.  When she testified, respondent never clearly answered where she would live, describing an address in one town and a trailer in another town.  When asked how she would care for her basic physical needs, respondent stated:

> "Well, first of all they have my driver's
> license because they tried to kill me in
> '95, car wreck and entrapment in '96.  It's

all involved in George Ryan license for
bribes.  Goes along with Kevin Grady had
my driver's license.  I could work even as
a waitress or any other, you know, job.
I am not incapacitated.  My nurse's license
are [sic] inactive."

When asked if she eats regularly, respondent discussed her mother leaving a house to her and her father getting mad at her when she tells him that.  Respondent stated she did not feel like taking her own life, but when asked if she ever told anybody at McFarland that she might take her own life, she stated, "Here, no."  When asked if she had a desire to physically harm anyone, she stated, "No.  But I am not going to be beat on either." Later in the hearing, when asked if she thought there was any chance she could engage in serious physical harm to herself or another, respondent stated, "If they don't attack me, I will be fine."  Throughout the hearing, respondent discussed how "they" put illicit drugs in her drink and smeared blood on her.  Respondent also discussed Enron, George Ryan, rape, and murder.

Based on respondent's testimony, which the trial court described as containing "numerous thoughts" and "ramblings" "making little, if any sense," the court's finding that respondent failed to establish a prima facie case for discharge is not against the manifest weight of the evidence.

### D. The Dissent

Justice Knecht's dissent addresses important questions about the handling of these cases. Does a petition for involuntary admission require some consideration of respondent's best interests? Or is it more a ritual, where the courts simply make sure that all boxes have been checked? Is respondent's counsel, or respondent herself, allowed to make any decisions? It is important that statutory requirements be complied with but elimination of any ability on the part of the court or counsel to exercise discretion and act in the best interest of respondent frustrates the purpose of the Code. Unfortunately, technical violations in these cases are usually raised for the first time in the appellate court, without having been addressed by the trial court.

### III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

STEIGMANN, P.J., concurs.

KNECHT, J., dissents.

JUSTICE KNECHT dissents:

Respondent was improperly transferred to McFarland Mental Health Center. The Code does not permit the transfer of a respondent from a private facility to a Department facility in these circumstances. There is no statutory authority to initiate such a transfer.

The State should not have made the transfer motion,

- 22 -

respondent's counsel should not have agreed to the transfer, the judge should not have entered the order, and McFarland should not have accepted respondent's transfer; and this court should reverse.

Respondent's counsel is her lawyer, not her social worker. Counsel has no authority to acquiesce to the transfer of the client from a local hospital to a confined mental-health facility operated by the department simply because such a transfer may appear inevitable. When a petition is filed seeking to take away someone's liberty--even if the world at large believes it is for the person's own good--it is an adversarial proceeding. The State had an obligation to timely bring the petition to hearing, observe the rights of respondent and prove the case.

Instead, respondent was transferred to a restrictive state facility before the hearing. She was transferred in advance to the same facility where she would be confined when, and if, anyone proved she belonged there. Prejudice is inherent in such a transfer. When the hearing finally took place, it had been continued three times. A cynic would suggest there was less motivation to hold the hearing with dispatch because she was already confined where medical professionals wanted her to be.

Perhaps if I had a family member who needed treatment, I would think such a transfer was a good idea. Perhaps the legislature should authorize such transfers. Until that occurs,

I contend this respondent was improperly transferred to her prejudice. There is no dispute respondent is mentally ill. Her schizo-affective disorder rendered her delusional with poor judgment. The majority suggests respondent agreed to the transfer. If she agreed, what weight should be given to that agreement given her illness?

Mental-health cases are treated differently than other proceedings because we have permitted them to become different. Just as society is uncomfortable with the mentally ill, so too are lawyers and courts. That discomfort may make us forget the purpose of the statutory framework is to protect the seriously mentally ill, not just from themselves, but from us.