*In re* O.C., a Person Found Subject to Involuntary Admission (The People of the State of Illinois, Petitioner-Appellee, v. O.C., Respondent-Appellant).

Fourth District No. 4—02—0551

Opinion filed April 11, 2003.

Jeff M. Plesko, of Guardianship & Advocacy Commission, of Anna, and Cynthia Z. Tracy (argued), of Guardianship & Advocacy Commission, of Peoria, for appellant.

Scott Rueter, State's Attorney, of Decatur (Norbert J. Goetten, Robert J. Biderman, and Charles F. Mansfield (argued), all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE KNECHT delivered the opinion of the court:

Respondent, O.C., appeals the trial court's June 2002 order finding him subject to involuntary admission to a mental health facility pursuant to section 3—700 of the Mental Health and Developmental Disabilities Code (Mental Health Code) (405 ILCS 5/3—700 (West 2000)) and involuntary administration of psychotropic medication pursuant to section 2—107.1(a—5) of the Mental Health Code (405 ILCS 5/2—107.1(a—5) (West Supp. 2001)). Respondent contends (1) no clear and convincing evidence warranted respondent's involuntary admission, (2) hospitalization was not the least-restrictive treatment alternative, (3) respondent's procedural due process rights were violated, and (4) no clear and convincing evidence warranted an order for involuntary administration of psychotropic medication. We reverse.

## I. BACKGROUND

On June 21, 2002, Amy Mundwiler, a supervisor at Heritage Behavioral Health Center (Heritage), filed a petition for involuntary admission of respondent by court order. The petition alleged respondent was a person who was mentally ill and who, because of his illness, was reasonably expected to inflict serious physical harm upon himself or another in the near future. Specifically, the petition stated respondent was observed the day before dancing in the middle of a street and then yelling for someone to "get away from me or I'll beat your f---ing ass" when no one was around him. Further, respondent allegedly made a phone call stating he is a Green Beret and he will draw "first blood." The trial court ordered the clerk to issue a writ directing the sheriff to take custody of respondent. Two doctors examined respondent and filed certificates finding respondent was subject to involuntary admission and in need of immediate hospitalization.

On June 24, 2002, Stephen Rathnow signed a petition for administration of authorized involuntary treatment. However, the petition was not file-stamped, and the docket sheets in the record do not indicate the petition was formally filed. Also on June 24, the trial court appointed counsel for respondent and set a hearing for June 25 on Mundwiler's petition. The trial court directed the clerk to send notice of the hearing, and a sheriff's deputy delivered notice to respondent on that day.

On June 25, 2002, the trial court held a hearing on the petition for involuntary admission. Mundwiler testified she was familiar with respondent through Heritage for about five years. Respondent's diagnosis went between bipolar disorder and schizo-affective disorder during that time. Mundwiler overheard respondent talking to a case manager, and respondent discussed how he was walking around Decatur telling people off to release his frustrations. Mundwiler heard respondent say he did not want to have to hurt anyone.

Dr. Patil testified he saw respondent in the evening after his admission. Patil characterized respondent as being very paranoid, suspicious, delusional, agitated, extremely loud, boisterous, and grandiose. Patil diagnosed respondent with bipolar disorder. Respondent had not been completely compliant with medications. Patil believed respondent was a person who was mentally ill and, because of his illness, was reasonably expected to inflict serious physical harm upon himself or another. Patil noted, "With paranoia, suspiciousness, and grandiosity, he is likely to misperceive what other people's motives are and he may work [sic] out unknowingly, not knowingly." Patil highly recommended McFarland at the least-restrictive placement. On cross-examination, Patil noted respondent's loud and boisterous behavior on the unit required intervention but respondent did not "come across to threaten anybody."

Lynn Schollenbruch, a case manager at Heritage, observed respondent screaming and cussing on a park bench while holding a guitar. She heard respondent threatening to hurt people, but no one in the area seemed to be responding to him. On cross-examination, she testified respondent had headphones around his neck. Schollenbruch heard respondent speak, "I'm going to kill you," although she did not witness respondent threaten any particular person who was nearby.

Schare Antoniou testified on respondent's behalf. She had dated respondent for three years. She visited him on June 20, 2002, and he did not seem unusual. She never saw respondent do anything like cussing on the street. Respondent consistently took his medications. Respondent listens to rap music, amongst other varieties, and he likes to sing to the words. Brenda Antoniou, Schare's mother, also testified

for respondent. She knew respondent for three years. She stated she saw respondent on June 19 or June 20 and he was not delusional or threatening.

Respondent's counsel argued respondent had never harmed anyone and he was merely singing along to rap music. The trial court found the State's witnesses to be more credible. The trial court found the allegations proved by clear and convincing evidence and found respondent to be a person subject to involuntary admission. The trial court ordered respondent to be hospitalized in the Department of Mental Health and Developmental Disabilities for up to 90 days.

After the trial court admonished respondent of his appeal rights, Mary Bolton, the assistant State's Attorney, noted the petition for involuntary treatment. The trial court inquired whether that hearing was set for that day, and Bolton replied, "I think it should be." The trial court then stated, "You're correct," and proceeded.

Dr. Patil prescribed lithium and Depakote to stabilize mood. Zyprexa treats psychotic symptoms such as delusions and paranoia. Respondent's Depakote levels were below normal, which is inconsistent with taking medication on a regular basis. Patil explained the safety of the medicines and the need for periodic blood testing. Respondent agreed to cooperate with Patil but refused when the nurses gave him the medicine. Patil stated respondent's mental state would tremendously improve with the medications and respondent would likely act out without the medications. On cross-examination, Patil noted dryness of mouth and excess urination as short-term side effects of lithium. Haldol would be administered if respondent did not cooperate. Haldol can cause stiffness, which would be taken care of with Cogentin. However, artificial muscular movements could develop in the long term.

Respondent testified he would take Depakote but he objected to lithium. Respondent earlier took lithium with Haldol and Cogentin, and he developed gynecomastia, requiring liposuction on his chest. The trial court then recalled Patil, who stated Haldol could produce gynecomastia but lithium would never have that effect. The trial court then granted the petition for involuntary treatment.

## II. ANALYSIS

### A. Involuntary Commitment

Respondent initially argues no clear and convincing evidence supported the trial court's finding he was reasonably expected to inflict serious physical harm upon himself or another in the near future. The State claims respondent's involuntary commitment was proper because his verbal outbursts are dangerous and harm is reasonably likely to occur. We agree with respondent.

█ A person is subject to involuntary admission if he is mentally ill and because of his illness is reasonably expected to inflict serious physical harm upon himself or another in the near future. 405 ILCS 5/1—119 (West 2000). A person may not be confined against his will merely because he is mentally ill if he is dangerous to no one and can live safely in freedom. *In re Schumaker*, 260 Ill. App. 3d 723, 727, 633 N.E.2d 169, 172 (1994). The State has the burden of showing the need for confinement by clear and convincing evidence (*Schumaker*, 260 Ill. App. 3d at 727, 633 N.E.2d at 172), and the trial court's decision will not be reversed unless it is against the manifest weight of the evidence (*In re Robinson*, 287 Ill. App. 3d 1088, 1097, 679 N.E.2d 818, 824 (1997)).

█ We find the trial court's decision to order respondent's involuntary commitment was against the manifest weight of the evidence because insufficient evidence supported the trial court's finding of a reasonable likelihood of future harm. The record contains no evidence respondent ever physically harmed himself or another. After respondent had been receiving outpatient treatment through Heritage for "a number of years," a case manager witnessed him on a park bench "screaming, cussing, and threatening to hurt people." However, respondent was not threatening anyone in particular, and no one seemed to respond to him. A supervisor at Heritage overheard respondent state he was telling people off to relieve his frustrations. Respondent's treating psychiatrist noted respondent's boisterous and loud behavior in the unit required staff intervention, but respondent did not physically threaten or harm anyone. Put together, the foregoing did not reach the level of clear and convincing evidence needed to find respondent to be "reasonably expected to inflict serious physical harm upon himself *** or another in the near future." 405 ILCS 5/1—119(1) (West 2000).

We recognize the State submitted explicit medical testimony respondent was reasonably expected to be a serious danger to himself or others as a result of his mental illness. However, the expert's opinion was not supported by evidence respondent intended to harm himself or another. See *Schumaker*, 260 Ill. App. 3d at 728, 633 N.E.2d at 173. Although respondent expressed statements such as "I'm going to kill you," respondent was also overheard stating he was going to relieve his frustrations by telling people off.

Further, an expert's opinion is only as valid as the reasons for it. *In re Winters*, 255 Ill. App. 3d 605, 609, 627 N.E.2d 410, 413-14 (1994). Patil's testimony revealed the basis of his opinion. Patil stated respondent "may" unknowingly act out by likely misperceiving other people's motives as a result of his mental illness. Patil's testimony

never referred to any incident leading to respondent's involuntary admission, and he failed to opine whether respondent was likely to act consistent with the witnessed "threats" as a result of his mental illness. See *Schumaker*, 260 Ill. App. 3d at 728, 633 N.E.2d at 173. No evidence showed respondent was reasonably expected to "act out" by inflicting serious physical harm upon himself or another as a result of his bipolar disorder.

Therefore, we reverse the trial court's order of involuntary commitment, and we need not address respondent's argument regarding least-restrictive treatment alternative.

## B. Authorized Involuntary Treatment

■ Respondent next asserts the trial court erred in entering an order for authorized involuntary treatment. We will reverse the trial court's decision only if it is manifestly erroneous. *In re Jones*, 285 Ill. App. 3d 8, 13, 673 N.E.2d 703, 706 (1996).

■ Section 2—107.1(a—5)(4) of the Mental Health Code (405 ILCS 5/2—107.1(a—5)(4) (West Supp. 2001)) requires proof of seven factors by clear and convincing evidence before authorized involuntary treatment can be administered to a respondent. The second factor states, "That because of said mental illness or developmental disability, the recipient exhibits any one of the following: (i) deterioration of his or her ability to function, (ii) suffering, or (iii) threatening behavior." 405 ILCS 5/2—107.1(a—5)(4)(B) (West Supp. 2001). Dr. Patil's testimony failed to state respondent presently exhibited either deterioration of his ability to function, suffering, or threatening behavior. Rathnow's report refers only to respondent's psychiatric history and past behavior. Because the State did not present clear and convincing evidence regarding the second factor, we need not address respondent's contentions regarding the other factors.

■ The trial court's decision was against the manifest weight of the evidence, and we reverse the trial court's order for involuntary administration of psychotropic medication.

## C. Procedural Due Process

■ Respondent finally claims he was denied procedural due process. The record shows respondent was not served with notice of the petition for administration of authorized involuntary treatment prior to the June 25, 2002, hearing. Under section 2—107.1(a—5)(1) of the Mental Health Code (405 ILCS 5/2—107.1(a—5)(1) (West Supp. 2001)), a respondent has a right to have at least three days' notice prior to a hearing on a petition for authorized involuntary treatment. The record also reveals the petition was never formally filed.

We take this opportunity to reiterate the following admonishment:

"The procedural safeguards enacted by the legislature are not mere technicalities. Rather, they are intended to safeguard the important liberty interests of the respondent which are involved in mental health cases. \*\*\*

\*\*\*

\*\*\* The total disregard for the legislatively established procedures is contrary to the balancing of interests established by the [Mental Health] Code and should not be condoned." *In re Luttrell*, 261 Ill. App. 3d 221, 230-31, 633 N.E.2d 74, 81-82 (1994).

### III. CONCLUSION

For the reasons stated, we reverse the trial court's orders of involuntary commitment and administration of psychotropic medication.

Reversed.

TURNER and STEIGMANN, JJ., concur.